NEW YORK STATE ASSOCIATION FOR RETARDED CHILDREN, INC., et al., and Patricia Parisi et al., Plaintiffs,

v.

Hugh L. CAREY, Individually and as Governor of the State of New York, et al., Defendants,

United States of America, Amicus Curiae.

Thomas A. COUGHLIN III, Individually and as Deputy Commissioner of the New York State Department of Mental Hygiene, Petitioner,

v.

The CIVIL SERVICE EMPLOYEES ASSOCIATION, INC., and Ronnie A. Smith, appearing on behalf of himself and others similarly situated, Respondents.

Nos. 72–C–356, 72–C–357.

United States District Court, E. D. New York.

June 7, 1978.

Christopher A. Hansen, Mental Health Law Project, New York City, Kalman E. Finkel, Legal Aid Society Civil Appeals & Law Reform Unit, New York City, Carol Kellermann, New York City, of counsel, Jack Bernstein, George M. Heymann, Protection and Advocacy System for Developmental Disabilities, Inc., New York City, for plaintiffs.

Louis J. Lefkowitz, Atty. Gen., New York City, for defendants; Robert S. Hammer, Asst. Atty. Gen., New York City, of counsel.

LeBoeuf, Lamb, Leiby & MacRae, New York City, Taylor R. Briggs, New York City, of counsel, for Thomas A. Coughlin, III and Alvin M. Mesnikoff.

Roemer & Featherstonhaugh, Albany, for respondents; Pauline F. Rogers, James D. Featherstonhaugh, Albany, of counsel.

William A. Carnahan, Paul F. Stavis, Margaret M. Corcoran, Paul Litwak, Albany, for New York State Dept. of Mental Hygiene.

Jackson, Lewis, Schnitzler & Krupman, New York City, for United Cerebral Palsy; Anthony H. Atlas, New York City, of counsel.

BARTELS, District Judge.

This is an ancillary proceeding arising out of an original suit under 42 U.S.C. § 1983 by mentally retarded residents of Willowbrook Developmental Center[1] against officials of the State of New York and the Department of Mental Hygiene (Department).[2] The ancillary complaint was filed by officials of the Department against the Civil Service Employees Association, Inc. (union), which is not a party to the main action, for a declaratory judgment that certain actions taken by the Department to comply with a decree entered in the original suit do not violate the state civil service law or the union's contractual rights. The Department has moved for summary judgment on its complaint, and the union has moved for its dismissal.

### Introduction

The underlying civil rights action was brought in 1972, and the major points of contention in the case were settled in April 1975 with the entry of a Consent Judgment providing for significant and detailed relief to the class. In November 1976 the plaintiffs made a motion to have the defendants (referred to herein collectively as the Department) held in contempt for failure to comply with the Consent Judgment, which was settled, however, by the entry of a Stipulation and Order on Consent on March 10, 1977.

The genesis of the present controversy lies in paragraph 3 of the Stipulation and Order on Consent, which required the Department to negotiate a contract to turn over five (now seven) of the twenty-seven buildings at Willowbrook to a private agency, United Cerebral Palsy (UCP), for complete operation and control.[3] This require-

---

1. Effective April 1, 1978, Willowbrook Developmental Center was renamed Staten Island Developmental Center.

2. Prior reported opinions in this case may be found at 438 F.Supp. 440 (E.D.N.Y.1977); 409 F.Supp. 606 (E.D.N.Y.1976); 393 F.Supp. 715 (E.D.N.Y.1975); 357 F.Supp. 752 (E.D.N.Y. 1973).

3. Paragraph 3 of the Stipulation and Order on Consent of March 10, 1977, states:

    A contract shall be sought by July 1, 1977 with United Cerebral Palsy ("UCP") for full operational authority over five residential buildings at the Willowbrook Developmental Center ("Willowbrook"), such buildings to be mutually agreed upon between the Department and UCP, and said contract to begin at the earliest possible date. UCP shall have the authority through this contract to hire the full staff to operate programs in some of the designated buildings. UCP shall operate some of the buildings with State staff and

ment was not acceptable to the union at Willowbrook and accordingly it obtained a temporary restraining order in the New York State Supreme Court, Albany County, against implementation of this provision of the Order.[4] The state court did not, however, grant the union's motion for a preliminary injunction, and the UCP takeover, although temporarily disrupted by the restraining order, was eventually consummated in the fall of 1977. The state court action still pends. In order that this court might pass on the validity of its own decree attacked by the union, it ordered the union to be joined as a defendant to this case for the limited purpose of determining whether the UCP takeover infringed any rights of the union under state law or under the union's collective bargaining agreements.[5]

> UCP supervisors pursuant to established shared staff policies. Employees transferred shall not by virtue of the transfer gain or lose any rights or benefits they would otherwise have. In addition, the following provisions shall be negotiated for and required in this contract:
> (a) Auditing for baseline data;
> (b) Adding the UCP and its officers as defendants herein subject to the same requirements of the Consent Judgment and to the same sanctions as the defendants without relieving the defendants of ultimate responsibility for implementation of the Consent Judgment;
> (c) Expanding the scope of the contract to cover other buildings if the operation originally contracted for proves successful;
> (d) Declaring a major objective to be preparing residents for community placement, and requiring UCP to work cooperatively with the Metropolitan Placement Unit (MPU) to that end; and
> (e) Sharing of training and information with Willowbrook staff.
> Nothing herein is intended to abrogate existing rights of state employees under existing collective bargaining agreements.

4. The complaint in the action of *Civil Service Employees Ass'n v. Kolb*, Civ. No. 5351–77 (Sup.Ct., Albany County, dated May 10, 1977), alleges that the turnover would violate former N.Y.Ment.Hyg.L. §§ 7.13 & 7.15 (McKinney 1976), recodified in N.Y.Ment.Hyg.L. §§ 13.11 & 13.17 (McKinney Supp.App.1977–78); N.Y. Civ.Serv.L. §§ 50 *et seq.* & 70 (McKinney 1973), and Art. V § 6 of the New York Constitution.

5. There are actually four collective bargaining agreements governing different classes of employees at Willowbrook. The provisions of the

See *N.Y.S.A.R.C., Inc. v. Carey,* 438 F.Supp. 440 (E.D.N.Y.1977).

Specifically, the Department of Mental Hygiene seeks a declaration (a) that the UCP takeover does not violate either Article V § 6 of the New York Constitution, N.Y.Ment.Hyg.L. § 13.11(b) (McKinney App.Supp.1977–78), or N.Y.Civ.Serv.L. § 70 (McKinney 1973), and (b) that the takeover does not come within the "contracting out" provisions of the union's collective bargaining agreement.[6] The parties have submitted a large number of affidavits and exhibits on the Department's motion for summary judgment which reveal, despite the union's contention to the contrary, that there is no genuine dispute as to any material fact.[7] The court is thus in a position to

agreements which concern us here are identical in each.

6. The Department's complaint here does not specifically refer to N.Y.Civ.Serv.L. §§ 50 *et seq.*, as does the union's, *see* note 4, *supra,* but it does seek a general declaration that the Civil Service Law is not violated. The contracting-out claim made by the Department does not appear in the union's state court complaint.

7. Affidavits executed by counsel for the CSEA and for the Department violate the requirement of Fed.R.Civ.P. 56(e) that "supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." *See* our Memorandum-Order of Nov. 21, 1977; *Schiess-Froriep Corp. v. S. S. FINNSAILOR,* 574 F.2d 123 (2d Cir. 1978); *Hanke v. Global Van Lines,* 533 F.2d 396 (8th Cir. 1976). For this reason, such affidavits are insufficient to show the presence or absence of a genuine issue of material fact.

The union raises a claim that it needed more time for the discovery of facts essential to justify its opposition, *see* Fed.R.Civ.P. 56(f). This claim is without merit. On September 7, 1977, the union and the Department were ordered to complete discovery forthwith and the ancillary complaint was filed on September 26, 1977. Commencement of discovery in the federal courts does not depend on "joinder of issue" as the union seems to contend. *See, e. g.,* Fed.R. Civ.P. 27(a), 30(a), 3. While the court's Order of October 11, 1977, staying enforcement of its September 7, 1977 Order, from October 11 to October 14, 1977, may have temporarily excused the union from its obligation promptly to

present a fairly detailed picture of the nature and structure of the UCP takeover. Thereafter we shall address seriatim the applicability of the civil service laws to the takeover; the validity of the action under the Mental Hygiene Law; the contracting out issue; and, finally, some of the points raised in the union's motion to dismiss.

## Nature of UCP Takeover

United Cerebral Palsy of New York State, Inc. is a nonprofit New York corporation with affiliates located throughout the state. It has been closely involved with the Willowbrook class for a considerable length of time, and in fact has been caring for fifty of the most disabled adult class members at its own Nina Eaton Center. It has also been providing training to Departmental employees at Willowbrook through "mini-teams" on location there. Impressed with the achievements of UCP in these areas and dissatisfied with the Department's failures, plaintiffs, during negotiations to settle the contempt proceedings mentioned above, proposed that UCP take over five buildings at Willowbrook with authority to use or not to use Willowbrook staff; that UCP become a party defendant to the main action; and, if the experiment was successful, that UCP would further expand its operations at Willowbrook. The essential elements of the plaintiffs' proposal were, as we have seen, acceded to by the Department and embodied in this court's supplemental decree. Pursuant thereto and in implementation thereof, the Department instituted intensive discussions with UCP which culminated in a Memorandum of Agreement between the Department and UCP, a Revocable Permit for UCP to enter and use specified buildings at Willowbrook, and a Certificate of Operation.

## Agreements

The Memorandum of Agreement states that UCP will "establish and operate a privately licensed intermediate care facility for the mentally retarded [ICF/MR]," and that UCP will have "exclusive use, occupancy and control" of the relevant buildings, which constituted the "baby complex" at Willowbrook and are now known as UCP Unit VI. UCP agreed to "provide care and treatment to members of the Willowbrook class discharged from the Willowbrook Developmental Center" and to become a defendant in this case, and further agreed that

> in the event this Department is faced with continuing legal obligations for discharged employees of the Willowbrook Developmental Center, United Cerebral Palsy will either agree to absorb such employees or agree to terminate this agreement at the election of this Department.

The Permit, which continues indefinitely and is revocable only by order of this court, sets forth the conditions under which UCP is permitted to use state buildings at Willowbrook for its ICF/MR. It also recites that UCP had applied for permission to use certain portions of such property to provide "intermediate care services to approximately six hundred and fifty (650) mentally disabled former residents" of Willowbrook, and that such application was acceptable to the Department and authorized under (former) N.Y.Ment.Hyg.L. § 9.05(c). The Permit accordingly grants UCP permission "to enter upon and have exclusive use, occupancy and control" of the premises under certain enumerated conditions. Occupation and use of the premises were limited to the provision of intermediate care services to the residents thereof, and UCP agreed to apply for federal certification as an ICF/MR. The Department, which retained ownership and which has ultimate responsibility for the real property, also retained general responsibility for major and structural repairs, and agreed to assist UCP in

undertake discovery, it appears that at no time during the first months of this ancillary proceeding did the union attempt discovery proceedings. It was at the union's own peril that it failed to do so. In any case, the record, which the court itself ordered supplemented, see Memorandum-Order of November 21, 1977; Fed.R.Civ.P. 56(f), is so complete that there is no doubt that further discovery would be of no assistance to the union.

meeting the ICF/MR construction standards. It also reserved the right to inspect the premises and to make reasonable recommendations on repairs necessary to restore the premises to their original condition.

Under the Permit, UCP is responsible for ordinary maintenance, the cost of utilities, etc., transportation, food, health, and other services, as well as "all other conditions required under the Willowbrook Consent Decree." It is also obligated to provide all supplies necessary to operate its programs independently of the Department, although the equipment already in the buildings was inventoried and left for UCP's use during its occupation. UCP agreed in addition to "assume all responsibility in the operation and conduct of its intermediate care program," and to hold harmless the Department from any liability incurred therein.

Of crucial importance to the resolution of this controversy is the status of the residents of UCP Unit VI. It appears to have been originally intended that the residents would remain on Willowbrook's rolls on "community status," and that the Department, by entering into an agreement with UCP, would be purchasing services for persons under its jurisdiction. However, when it was decided that UCP Unit VI would be an independent ICF/MR, the decision was made to release the residents from Willowbrook and to transfer them to UCP Unit VI pursuant to N.Y.Ment.Hyg.L. § 29.11 and 14 N.Y.C.R.R. Part 17. This release and transfer has had the effect of passing all custody and control over the residents of UCP Unit VI from the Department to UCP [8]—except for such control over UCP Unit VI as the Department exercises in its regulatory capacity over all mental health facilities, public and private.

*State Regulations*

The Commissioner of Mental Retardation has general authority under N.Y.Ment. Hyg.L. § 31.04 to adopt regulations with respect to the standards of care for the mentally retarded in residential facilities, and has the power and duty to inspect such facilities. N.Y.Const. Art. 17 § 4; N.Y. Ment.Hyg.L. §§ 5.05, 31.07.[9] No provider of services to the mentally retarded, other than the State, may operate a residential facility without an operating certificate from the State. *Id.* § 31.02. UCP Unit VI received its Certificate on September 1, 1977. The Commissioner has promulgated certain regulations for the operation of schools for the mentally retarded in 14 N.Y. C.R.R. Part 81 which set out general standards for schools with respect to policy, organization, responsibility, and programming. They are not, however, so detailed as to remove from the provider effective control over the organization and management of the facilities from the provider and place them in the hands of the Department.

*Funding*

The distinction between Willowbrook and UCP Unit VI is reflected in the different means by which they are funded. Willowbrook is funded entirely by annual appropriations by the New York state legislature. For those of its residents eligible for Medicaid, the Department of Mental Hygiene bills the Department of Social Services, which in turn bills the United States Department of Health, Education and Welfare for the monies due, which, when received, are deposited in the New York state treasury in a special fund to be used exclusively for medical assistance. N.Y.Soc.Serv.L. § 363–a(4). On the other hand, UCP Unit

---

**8.** N.Y.Ment.Hyg.L. §§ 1.03(29) & (31) (McKinney Supp.App.1977–78) define "release" as "the termination of a patient's in-patient care at a school, hospital or alcoholism facility," and "discharge" as "release and the termination of any right to retain or treat the patient on an in-patient basis." The terms "release" and "discharge" appear to reflect different degrees in the finality of the determination as to the person's mental capacity, and do not indicate

the existence of any particular control over the person by the school from which he has been released but not discharged. *See* N.Y.Ment. Hyg.L. §§ 15.13, .15, .19, .25, .27, .31, .35 & 29.11(g) (McKinney Supp.App.1977–78).

**9.** *See* the Opinion and Order in this action of March 23, 1978, for a description of other entities exercising supervisory control over Willowbrook and UCP Unit VI.

VI services are funded entirely through Medicaid. UCP bills the New York City Department of Social Services for services rendered, the New York City Department of Social Services is reimbursed by the state Department of Social Services (in a few cases there is a contribution by New York City for 25% of the costs), which is in turn reimbursed by the Department of Health, Education and Welfare for 50% of the costs.

In order to be eligible for Medicaid funds, UCP Unit VI must also comply with the extremely detailed federal standards for intermediate care facilities for the mentally retarded in addition to the regulations promulgated by the Commissioner of Mental Hygiene. *See* 45 C.F.R. §§ 249.10 & 249.13.

By virtue of its participation in the Medicaid program, UCP Unit VI is also subject to the supervision of the New York State Department of Health, *see* N.Y.Soc.Serv.L. §§ 364, 364–a (McKinney 1976), which also monitors the quality of services provided at Willowbrook, itself in the process of complying with the federal ICF/MR standards.

### Recruitment of Personnel

Certain peculiarities with respect to the recruitment of personnel for the UCP operation at Willowbrook are also relevant to the instant controversy. In particular, four of the UCP buildings are administered and operated entirely by UCP personnel, and three of the buildings—the "shared staff" buildings—are administered by UCP personnel but staffed in the direct care positions by state employees.

UCP recruited some of the direct care staff for the 100% UCP buildings with the assistance of two officials of the New York City Human Resources Administration who had previously been of assistance to UCP in another recruitment job, and recruited others from state employees at Willowbrook who decided to work for UCP. In these efforts UCP was assisted by the administration at Willowbrook, which posted two notices on bulletin boards describing the job opportunities at UCP and which, the record reveals, was very anxious that UCP hire as many Willowbrook employees as possible to assist Willowbrook in the "rundown" of its employees.[10] In view of the uncertainty surrounding the UCP takeover and the revocable nature of the Permit, the Department took the unusual step of granting leaves of absence until March 31, 1978, to Willowbrook employees who chose to work for UCP. The Department also assisted UCP in the training on Willowbrook's campus of 154 persons recruited by UCP prior to the takeover, and when UCP could not pay these persons because of the state court restraining order, the Willowbrook administration made special arrangements to pay them, pending reimbursement by UCP upon its receipt of federal Comprehensive Employment and Training Act funds.

The concept of shared staffing which is embodied in paragraph 3 of the Stipulation and Order on Consent originated with the plaintiffs and was only reluctantly accepted by UCP, which foresaw—and has experienced—difficulties because of the division of authority over shared employees. In particular, UCP is fully responsible for program administration, supervision and management, and all upper level positions are filled by UCP personnel, but UCP does not control the payroll, grievance proceedings or discipline of the shared direct care staff, which remains in the hands of Willowbrook's administration. The shared direct care staff concededly have retained their identity as state employees and their status is not in question in this action.

### No Violation of Civil Service Laws

Article V § 6 of the New York State Constitution states in pertinent part:

Appointments and promotions in the civil service of the state and all of the civil divisions thereof . . . shall be made according to merit and fitness to be ascertained, as far as practicable, by exami-

---

10. *See* note 17, *infra*.

nation which, as far as practicable, shall be competitive  .   . ..[11]

The intendment of this provision, adopted in 1894, was to supplant the spoils system with the merit system. *Social Investigator Eligibles Ass'n v. Taylor*, 268 N.Y. 233, 197 N.E. 262 (1935). Although the legislature has enacted laws dealing with the civil service, the constitutional provision is self-enforcing where there are gaps in the legislation, *Kraus v. Bennet*, 275 N.Y. 302, 9 N.E.2d 938 (1937). No law which purports to circumvent or avoid the requirements of civil service appointments is valid. *Ottinger v. Civil Service Comm'n*, 240 N.Y. 435, 148 N.E. 627 (1925). In fact, a person holding an administrative position by a contract with the state entered into in good faith which does not comply with the civil service laws cannot recover damages from the state for breach of contract upon discharge, and this issue may be raised by the court *sua sponte*. *Palmer v. Bd. of Ed.*, 276 N.Y. 222, 11 N.E.2d 887 (1937). *See* N.Y.Civ.Serv.L. §§ 95, 102 (McKinney 1976).

■ On the other hand, neither the constitution nor the statute requires that all services furnished or all labor performed in connection with or on behalf of a governmental agency must be supplied by persons directly employed by the state or a subdivision thereof. *E. g., Corwin v. Farrell*, 303 N.Y. 61, 100 N.E.2d 135 (1951); *Beck v. Bd. of Ed.*, 268 App.Div. 644, 52 N.Y.S.2d 712 (1945), *aff'd*, 295 N.Y. 717, 65 N.E.2d 426 (1946); *Damino v. County of Nassau*, 56 930, 393 N.Y.S.2d 48 (1977); *Westchester County CSEA, Inc. v. Cimino*, 58 869, 396 N.Y.S.2d 692 (1977). These cases indicate that where the relationship between the state and the person whose status in question is not one of employer-employee, but is a genuine relationship of principal-independent contractor, the independent contractor furnishing goods or services to the state is not subject to the civil service requirements. This is best illustrated by *Corwin v. Farrell, supra,* which involved the dismissal of seven title searchers employed by the New York City Housing Authority and the contracting out of their work to private firms by the Authority, which had been under severe federal and state pressure to search titles more efficiently. The Court of Appeals noted several advantages of the changeover to this "modern business practice" and found that the Authority's action was not exercised in bad faith, arbitrarily or capriciously, nor in an attempt to evade the civil service laws. The Authority did not select, control or even approve the officers or employees of the contractor, fix their compensation or hours of work, exclusively engage them or restrict them from engaging in business with whomever they chose. For these reasons the court found there was no employer-employee relationship and therefore no "appointment" in the civil service.

■ The facts of *Corwin* closely parallel those of the instant case, where the defendants were under severe pressure by the plaintiffs, the Willowbrook Review Panel and this court to comply with the Consent Judgment. Both plaintiffs and defendants, based on defendants' past experience at Willowbrook, believed in good faith that the required results could better be obtained by the UCP than by the Department;[12] it was

---

11. N.Y.Civ.Serv.L. § 2(5) (McKinney 1973) states: "The 'civil service' of the state of New York or any of its civil divisions includes all offices and positions in the service of the state or of such civil divisions  .   . .."

12. The Court of Appeals has stated that an action lawful in form cannot be used to "cloak a design to oust from his position a person lawfully appointed and to substitute a person not appointed according to merit and fitness .   . .." *Wipfler v. Klebes*, 284 N.Y. 248, 255, 30 N.E.2d 581, 585 (1940). The burden of showing the lack of good faith involved in such a subterfuge lies on the plaintiff. *Id.* The union seeks to benefit from this rule by an assertion contained in one of its memoranda that an official of the Department admitted that the purpose behind the UCP contract was that UCP was not bound by the restrictions of the Civil Service Law, and by an assertion in an affidavit submitted by counsel for the union that in a deposition (which has not been submitted), an Assistant Attorney General involved in negotiation of paragraph 3 of the Stipulation and Order on Consent stated that "it was acknowledged that the Civil Service Law's procedures constitute an 'impediment' to

in this spirit that the UCP contract was executed. The civil service laws are not violated when private organizations are called in to meet technical problems which they are specially equipped to master, *Civil Service Technical Guild v. LaGuardia,* 181 Misc. 492, 44 N.Y.S.2d 860 (Sup.Ct.1943), *aff'd,* 267 App.Div. 860, 47 N.Y.S.2d 114, *aff'd,* 292 N.Y. 586, 55 N.E.2d 49 (1944), even where the work could have been done, although possibly with less satisfaction, by individuals taken from civil service lists. *Damino v. County of Nassau, supra; Beck v. Bd. of Ed., supra.*

■ *Beck,* which provides another helpful illustration of the principles at issue, involved the indirect system of custodial care of public schools, whereby the custodian, a civil servant, is given a lump sum and has the sole and exclusive right to employ and discharge cleaners and helpers who aid him. The Appellate Division, affirmed by the Court of Appeals, held that custodial assistants do not become civil servants or governmental employees merely because they work in a public building for the benefit of the government. A person becomes a civil servant only when he is paid directly by the state for labor furnished to it, or if the state controls his selection, or rate of pay, or conditions of work. *See also Guastoferri v. Bd. of Ed.,* 270 App.Div. 946, 62 N.Y.S.2d 257 (1946), *rev'g* 183 Misc. 158, 47 N.Y.S.2d 561 (Sup.Ct.1944). *Cf. Conlin v. Aiello,* 92 Misc.2d 235, 399 N.Y.S.2d 851

(Sup.Ct.1977). In the case at bar, none of the above criteria of civil service status is satisfied. The rates of pay [13] and conditions of work at UCP Unit VI are determined by UCP, and while UCP Unit VI is subject to state and federal regulation, such regulation is directed primarily to the quality of care, not to the employer-employee relationship and is insufficient to make UCP's employees state employees. *See Van Campen v. Olean Gen'l Hospital,* 210 App.Div. 204, 205 N.Y.S. 554 (1924), *aff'd,* 239 N.Y. 615, 147 N.E. 219 (1925). As *Beck* indicates, it is irrelevant that the UCP operation is housed in state buildings, particularly in view of the nearly complete control UCP has over the buildings. *Westchester County CSEA, Inc., supra.*

■ The state's assistance and interest in UCP's recruitment as discussed above reveals nothing to suggest that UCP was in anything less than complete control over the actual hiring and compensation of its staff. The contingent agreement by UCP to discontinue operations or absorb state employees in the event the state is found to be liable to state employees as a result of UCP's operations does not amount to such control over the selection of UCP's present staff as to render them civil servants. [14]

■ Finally, the UCP Unit VI personnel are not paid directly by the State as are state employees. In fact, unlike the cases cited above, which deal with the conditions

---

hiring and recruitment." Such hearsay assertions are completely insufficient to raise an issue of fact with respect to the good faith of the Department. *See* note 7, *supra.* To the contrary, the record shows only that UCP was brought in because the plaintiffs and the Department were of the considered opinion that it could do a better job than the state at a time when the state was close to being found in contempt of court. Additionally, paragraph 3 of the Stipulation and Order on Consent explicitly states that the rights of state employees were to be protected, and the experiment with the shared staffing buildings shows the intent of the parties to do so. Although the union may feel that it and its members are serving as a scapegoat for all of the problems at Willowbrook, there is no evidence that this is so. The record raises no question that the UCP contract was not "employed as a scheme to oust civil service employees simply to make room for

others, or to mask a true employment relationship, or to circumvent the civil service laws . . . ." *Corwin v. Farrell,* 303 N.Y. 61, 68, 100 N.E.2d 135, 139 (1951).

**13.** By way of comparison, UCP pays higher salaries to its direct care staff than does the Department, but it has no pension plan.

**14.** By way of contrast, *see Turel v. Delaney,* 285 N.Y. 16, 32 N.E.2d 774 (1941), where a purported outside contractor was to employ assistants to be approved by the Board of Transportation at salaries set by the Board, and where the principal contractor himself was to be remunerated at a set salary. Such control, the Court of Appeals held, indicated that the Board was merely illegally hiring the contractor.

under which the state may contract out work under the civil service laws, UCP Unit VI does not even receive its operating funds pursuant to a contract with the state in which UCP agrees to render certain services to the state. Instead, the relationship between the state and UCP reveals the essential fact that UCP Unit VI does not render services to the state or to its clients on behalf of the state as an agent, but renders services to its clients as a principal on its own behalf and on behalf of its clients. The state has performed its obligations to care for the mentally retarded residents of the baby complex by releasing them into the custody of a competent private organization which all concerned have determined will provide even better care. The fact that UCP Unit VI receives Medicaid monies from the state on behalf of the residents does not weaken its independence. *See* 42 U.S.C. § 1396. In *Van Campen v. Olean Gen'l Hospital, supra,* the court contrasted state and municipal hospitals with private hospitals, holding that the private character of the latter was not affected by donations from the government to enable them to carry on their work and care for indigents.[15] Any other holding would make providers of services who deal almost exclusively with Medicaid beneficiaries *ipso facto* civil servants, and we have located no case which so holds.

The above analysis permits but a single conclusion, that Article V § 6 of the New York constitution is in no way offended by the operation of UCP Unit VI. This is so not only because there has been no "appointment" in the civil service of the state under the *Corwin* line of cases, but also and equally because UCP Unit VI is not even in the "service" of the state, but is in "service" to individual Willowbrook residents released by the state. We believe the above discussion also disposes of any contention that the UCP takeover violates any provi-

sions of the Civil Service Law regarding recruitment of personnel or transfer of personnel, N.Y.Civ.Serv.L. §§ 50 *et seq.,* 70, for there is no indication that the Civil Service Law is broader in scope than Article V § 6 of the state constitution.

### No violation of N.Y. Mental Hygiene Law §§ 13.11 & 13.17(b)

The union argues that the turnover of seven buildings at Willowbrook to UCP amounts to a "discontinuance" of Willowbrook Developmental Center in violation of N.Y. Ment.Hyg.L. §§ 13.11 & 13.17(b). Section 13.11(b) (McKinney Supp.App.1977–78) states that

> The commissioner shall control the organization of the office and may continue, establish, discontinue, expand and contract facilities under his jurisdiction. The facilities set forth in section 13.17 [which include Willowbrook] may not be discontinued by the commissioner. Units and facilities shall have such functions, duties, and responsibilities as may be assigned to them by the commissioner.

Also relevant is Ment.Hyg.L. § 13.17(d) (McKinney Supp.App.1977–78), which authorizes the Commissioner [16] to

> permit . . . any public or private non-profit organization or political subdivision of the state to operate programs for the mentally retarded and developmentally disabled, not inconsistent with the programs and objectives of the office in any facility under his jurisdiction.

The union's attack on the Department's authority to enter into the agreement with UCP is in reality a minor aspect of a deeper political struggle between the union and the state. The state is committed to the deinstitutionalization of the mentally retarded persons in its care, and while the union does not oppose this policy, it objects strenuously to the state's practice of placing its clients

---

**15.** The court noted, however, that at that time such hospitals were supported mainly by voluntary gifts.

**16.** On January 4, 1977, the Commissioner of Mental Hygiene delegated all supervisory, oversight and operational responsibility for the im-

plementation of the Consent Judgment to the Deputy Commissioner of Mental Retardation, who, as of April 1, 1978, became Commissioner of Mental Retardation. *See* N.Y.Ment.Hyg.L. § 5.03 (McKinney Supp.App.1977–78).

with private or local governmental agencies because, the union claims, only the state is able to provide the services needed in a humane manner. The union also contends that the state's placement practice threatens state employees' jobs, which is in reality the motivation of its opposition. However, whatever the validity of the union's political stance, the above-quoted statutes make it clear that the union's legal argument that the turnover of seven out of twenty-seven buildings at Willowbrook to UCP is a "discontinuance," and not a contraction of Willowbrook, is without merit.

### Rights Under the Collective Bargaining Agreement

Article 22.1 of the collective bargaining agreement between the union and the state provides: "There shall be no loss of present jobs by permanent employees as a result of the State's exercise of its right to contract out for goods and services." The state seeks a declaratory judgment that the turnover of the baby complex to UCP does not come within the prohibition of this Article.[17] Ordinarily our finding concerning the alleged civil service violation to the effect that UCP Unit VI does not render services to or on behalf of the state would be dispositive of the contracting-out claim. However, pursuant to the declared policy of New York state, the relevant collective bargaining agreements between the union and the state set out procedures for the resolution of contract grievances arising between the signatories.[18] Contract grievances are defined by Art. 34.1 of the Agreements as "dispute[s] concerning the interpretation,

application, or claimed violation of a specific term or provision of this Agreement," and may in general be grieved through a four-step procedure culminating in binding arbitration. Grievance procedures may be initiated by the State as well as by the union, according to Art. 34.3(b), which states: "The State shall initiate grievances against CSEA at [the arbitration level]." It is the union's position that the existence of these contractual grievance procedures precludes this court from deciding the merits of any claim under the contract.

■ It is clear that whether or not the parties agreed to arbitrate, and what issues they agreed to arbitrate, are questions for the court, *Atkinson v. Sinclair Refining Co.,* 370 U.S. 238, 82 S.Ct. 1318, 8 L.Ed.2d 462 (1962); *In re Arb. between Long Island Lumber Co. and Martin,* 15 N.Y.2d 380, 259 N.Y.S.2d 142, 207 N.E.2d 190 (1965). But it is equally well settled that the court must assiduously avoid usurping the functions of the arbitrator by deciding the merits of a grievance in the guise of determining the scope of the agreement to arbitrate. *United Steelworkers of America v. American Mfg. Co.,* 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960); *United Steelworkers of America v. Warrior & Gulf Navig. Co.,* 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960); *Bd. of Ed. v. Bellmore-Merrick Central High School Dist.,* 39 N.Y.2d 167, 383 N.Y.S.2d 242, 347 N.E.2d 603 (1976). Contracting-out grievances in particular have been characterized as "garden variety" grievances, *Int'l U. of Elec., Radio & Mach. Wrkrs., AFL–CIO v. Gen. Elec. Co.,* 332 F.2d 485 (2d Cir. 1964), and normally would

---

17. At the commencement of this action, Willowbrook was required to take on a large number of new employees to meet court-ordered client-staff ratios. Since the Department also bound itself to reduce Willowbrook from a facility housing over 5000 residents to an institution of 250 beds by April 30, 1981, most of Willowbrook's employees will inevitably be laid off, and these layoffs will be accelerated by UCP's partial takeover at Willowbrook. The union claims that no layoffs will occur prior to the expiration of the present collective bargaining agreements on March 31, 1979, and that any interpretation of the contracting-out clause of the agreement would therefore be academic.

In view of our denial of the Department's claim on other grounds, we need not reach this issue.

18. N.Y.Civ.Serv.L. § 200 (McKinney 1973). Sections 200 *et seq.* are commonly known as the Taylor Law. Section 210 prohibits strikes of state employees. Although it is the Taylor Law and not federal law which regulates the relations between the state and its employees, 29 U.S.C. §§ 185(a), 142(3), 152(2), (3), (5), the general principles are the same. *See In re Arb. between Long Island Lumber Co. and Martin,* 15 N.Y.2d 380, 259 N.Y.S.2d 142, 207 N.E.2d 190 (1965).

unquestionably be for the arbitrator to pass on, even if the court felt the particular claim was absolutely meritless. *United Steelworkers of America v. American Mfg. Co., supra; Long Island Lumber Co., supra.*

The obligation to arbitrate contract grievances cannot be avoided by the device of bringing an anticipatory action for a declaratory judgment. In *Buffalo Forge Co. v. United Steelworkers of America*, 428 U.S. 397, 96 S.Ct. 3141, 49 L.Ed.2d 1022 (1976), the Supreme Court held that violations of collective bargaining agreements should not even be preliminarily enjoined pending the arbitrator's decision on the merits because this would involve the court in hearings, findings and interpretations of the agreement in derogation of the arbitrator's task to decide the dispute. "It is incredible," the Court explained, "to believe that the courts would always view the facts and the contract as the arbitrator would; and it is difficult to believe that the arbitrator would not be heavily influenced or wholly preempted by judicial views of the facts and the meaning of contracts if this procedure is to be permitted." *Id.* at 412, 96 S.Ct. at 3150. *See also Republic Steel Corp. v. Maddox*, 379 U.S. 650, 85 S.Ct. 614, 13 L.Ed.2d 580 (1965); *Drake Bakeries, Inc. v. Local 50, American Bakery & Confec. Wrkrs. Int'l, AFL–CIO*, 370 U.S. 254, 82 S.Ct. 1346, 8 L.Ed.2d 474 (1962); *Bd. of Ed. v. Bellmore-Merrick Central High School Dist., supra.* It is the arbitrator's construction of the contract the parties have bargained for, not the court's. *United Steelworkers of America v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960); *Rochester City School Dist. v. Rochester Teachers Ass'n*, 41 N.Y.2d 578, 394 N.Y.2d 179, 362 N.E.2d 977 (1977).

Our research has uncovered only one instance where a judicial decision takes precedence over otherwise applicable contractual arbitration provisions. This occurs when relitigation of a point is barred by the doctrines of res judicata or collateral estoppel. The New York Court of Appeals has held that the collateral estoppel doctrines of claim preclusion and issue preclusion apply to arbitration as well as to judicial proceedings, *American Ins. Co. v. Messinger*, 43 N.Y.2d 184, 401 N.Y.S.2d 36 (1977), and that the res judicata or collateral estoppel effect of the prior determination is a question for the court, not for the arbitrator before whom the point is sought to be relitigated. *Rembrandt Industries, Inc. v. Hodges Int'l, Inc.*, 38 N.Y.2d 502, 381 N.Y.S.2d 451, 344 N.E.2d 383 (1976); *In re Arb. between Buchholz and Local 463, Int'l U. of Elec., Radio & Mach. Wrkrs.*, 15 N.Y.2d 181, 257 N.Y.S.2d 134, 205 N.E.2d 282 (1965); *City of Rochester v. A.F.S.C.M.E., Local 1635*, 54 A.D.2d 257, 388 N.Y.S.2d 489 (1976). *See Glens Falls Ins. Co. v. Colbert*, 44 A.D.2d 759, 354 N.Y.S.2d 237 (1974). *See generally Evergreens v. Nunan*, 141 F.2d 927 (2d Cir. 1944); *Hinchey v. Sellers*, 7 N.Y.2d 287, 197 N.Y.S.2d 129, 165 N.E.2d 156 (1959); 5 J. Weinstein, H. Korn & A. Miller, New York Civil Practice ¶ 5011.28, at 50–132 (1977).[19] Since the court is not in a position at this time to determine the relationship of its decision on the civil service issue to the contracting-out issue, the Department's claim for summary judgment on the contracting-out issue is denied without prejudice to its resubmission in an appropriate procedural context.

### Pending State Action

Most of the grounds for the union's motion to dismiss have already been disposed of in this opinion, the court's rulings from the bench, or in the prior opinion in this action, 438 F.Supp. 440, and call for no

---

19. *But cf. In re Citizens Day Care Center, Inc. v. Community & Soc. Ag. Employees U., D.C. 1707 Day Care Employees, C.S. A.E.U., A.F.S. C.M.E., AFL–CIO*, 59 A.D.2d 845, 399 N.Y.S.2d 10 (1st Dep't 1977); *In re City School Dist. v. Peekskill Faculty Ass'n*, 59 A.D.2d 739, 398 N.Y.S.2d 693 (2d Dep't 1977); *Alexander v.* *Gardner-Denver Co.*, 415 U.S. 36, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974); *In re Arb. between City School Dist. and Poughkeepsie Pub. S. Teach. Ass'n, Inc.*, 35 N.Y.2d 599, 364 N.Y.S.2d 492, 324 N.E.2d 144 (1974); 5 J. Weinstein, H. Korn & A. Miller, New York Civil Practice ¶ 5011.26 (1977).

further comment.[20] It is, however, appropriate to address the union's motion to dismiss the Department's complaint for lack of jurisdiction because of the pending state proceeding. Where the federal and state courts have concurrent jurisdiction over a case, a prior action pending in one forum does not preclude the other from also passing on the case. *E. g., Friedman v. N. B. C. Motorcycle Imports, Inc.,* 452 F.2d 1215 (2d Cir. 1971). However, the salutory rule has arisen that " 'a federal district court should, in the exercise of discretion, decline to exercise [diversity] jurisdiction over a [declaratory judgment] action raising issues of state law where those same issues are being presented contemporaneously in state courts.' " *Fay v. Fitzgerald,* 478 F.2d 181, 182 (2d Cir. 1973), quoting *Provident Tradesmens B. & T. Co. v. Patterson,* 390 U.S. 102, 126, 88 S.Ct. 733, 19 L.Ed.2d 936 (1968). In *Brillhart v. Excess Ins. Co. of America,* 316 U.S. 491, 62 S.Ct. 1173, 86 L.Ed. 1620 (1942), the Supreme Court explained that ordinarily such parallel proceedings would be uneconomical as well as vexatious, and that gratuitous interference with the orderly and comprehensive disposition of state court litigation should be avoided. Here the situation is far from ordinary, and our interference with the disposition of the civil service issue in the state court is far from gratuitous. Indeed, it is the state court proceedings which will interfere with the orderly and comprehensive disposition of litigation in this court. In fact, the litigation in this court began five years prior to the state court action and for this reason alone has precedence over the state action. *Beacon Constr. Co. v. Matco Elec. Co.,* 521 F.2d 392, 399 n.13 (2d Cir. 1975).

More fundamentally, even though the major issues in this case were settled by consent three years ago, a number of complex questions with respect to interpretation and enforcement of the Consent Judgment have since arisen and may be expected to arise in the future. Obviously the flexibility of the court in dealing with these problems and its ability to fashion complete and appropriate relief are seriously impaired when ancillary disputes are brought in other fora. *Montgomery County Bd. of Ed. v. Shelton,* 327 F.Supp. 811 (D.Miss. 1971); *Grenchik v. Mandel,* 373 F.Supp. 1298 (D.Md.1973). The proper procedure for the union to have followed in this controversy would have been to bring its claim before this court in the first instance. *Cf. Stallworth v. Monsanto Co.,* 558 F.2d 257 (5th Cir. 1977). By bringing the action in the state court, counsel for the union acted precipitately and burdened the Department, this court, and the state court with a case of

---

**20.** The union moved to dismiss the complaint filed by the Department because it was served on counsel for the union, pursuant to this court's Order of September 7, 1977, and not on the union itself. We later held that service of the order to show cause on the union was sufficient to bring it in as a party defendant, but erroneously stated that a summons and cross complaint had been required to be served on the union setting forth the Department's claims in an orderly fashion. 438 F.Supp. at 443 n.2. On October 28, 1977, the court ruled from the bench that the complaint served on counsel for the union was in the nature of an amended complaint which could properly be served on counsel under Fed.R.Civ.P. 5, since the union was already a party apprised of the issues by virtue of the order to show cause. Nonetheless, in order to satisfy the union on this highly technical issue, the court also ordered service of a summons and complaint on the union itself, which was effectuated in April 1978. In sum, the union has made no claim of possible prejudice resulting from the method of service which has not been completely cured, and we therefore reaffirm our ruling that service on the union was sufficient.

The claims that this action must fit within the confines of Fed.R.Civ.P. 14, and that this court lacks jurisdiction over the complaint, have been rejected in our opinion of September 19, 1977, 438 F.Supp. 440.

The union also claims that the decision in *Civil Service Employees Ass'n v. Kolb,* No. 77 CV 212 (N.D.N.Y., filed July 12, 1977), holding the union's state action non-removable for lack of federal jurisdiction is res judicata on the question of federal jurisdiction in this court. However, "ordinarily a judgment dismissing an action or otherwise denying relief for want of jurisdiction . . . does not preclude a subsequent action in a court of competent jurisdiction on the merits." 1B J. Moore's Federal Practice ¶ 0.405[5], at 659 (2d ed. 1974); *Waylyn Corp. v. United States,* 231 F.2d 544 (1st Cir. 1956). This rule is applicable here.

far greater magnitude than appears from the face of the union's complaint. Whatever the reasons for the union's choice of forum, it cannot deprive this court of its primary jurisdiction and duty to pass on matters directly calling into question the decrees it has issued in a case before it. This court cannot abdicate its responsibilities simply because another action has been brought elsewhere. *See* Opinion of Sept. 21, 1977, 438 F.Supp. 440, 447.

The Department has reiterated its claim for injunctive relief, requesting in particular an injunction against the union to prevent it from commencing any litigation in any other judicial forum to challenge the Consent Judgment and Stipulation and Order on Consent or any steps taken by the Department pursuant thereto; and an injunction against the union and any of its members "from taking any action to impede [the UCP takeover]." With one exception, we do not believe such relief is appropriate here. An injunction against "any action to impede [the UCP takeover]" would certainly be vague and overbroad, especially in light of the limitations imposed on this court by the Norris-LaGuardia Act, 29 U.S.C. §§ 101 *et seq.* The proper procedure for challenging aspects of the relief ordered in the Willowbrook case has been made eminently clear, and even if it was improper for the union to bring its action for declaratory relief in the state court, there is no showing of a reasonable likelihood that the impropriety will be repeated. *SEC v. Manor Nursing Centers, Inc.,* 458 F.2d 1082, 1100 (2d Cir. 1972). However, the court believes that keeping in mind the interests of justice and the economical use of judicial resources, it would be appropriate to enjoin further prosecution of the state court action at this time.

Section 2283 of title 28, U.S.C., states:

A court of the United States may not grant an injunction to stay proceedings in a State court except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments.

The clause "to protect or effectuate its judgments" was expressly added to make clear the power of the federal courts to enjoin relitigation of cases and controversies fully adjudicated by them. Reviser's Note, following 28 U.S.C.A. § 2283; *Samuel C. Ennis & Co. v. Woodmar Realty Co.,* 542 F.2d 45 (7th Cir. 1976), *cert. denied,* 429 U.S. 1096, 97 S.Ct. 1112, 51 L.Ed.2d 543 (1977); 1A Part 2 J. Moore's Federal Practice ¶ 0.208[3.–3] (2d ed. 1977). Further litigation in another forum of an issue which this court has fully and completely determined would not only be uneconomical and vexatious but would cast an air of uncertainty over the propriety of the UCP takeover which it is the purpose of this judgment to dispel.

### ORDER

For the reasons given above, the court hereby orders, adjudges and declares that the transfer of full operational authority to UCP over the specified buildings at Willowbrook and their residents pursuant to paragraph 3 of the Stipulation and Order on Consent does not violate either Art. V § 6 of the New York Constitution, the New York Civil Service Law or N.Y. Ment. Hyg. L. § 13.11(b). The Department's prayer for a declaration that any eventual loss of present jobs by permanent employees of the state resulting from such transfer will not be in violation of Art. 22.1 of the state's collective bargaining agreement with the union, is hereby denied without prejudice. The union is hereby enjoined from taking any further steps to prosecute the action of *Civil Service Employees Ass'n v. Kolb,* Civ. No. 5351–77 (Sup.Ct., Albany County, instituted May 10, 1977), and its motion to dismiss the Department's ancillary complaint is hereby denied. The Department's request for injunctive relief other than that hereinabove granted is hereby denied.

Pursuant to Fed.R.Civ.P. 54(b), the court determines that there is no just reason for delay in the entry of judgment and accordingly hereby orders the Clerk of this Court to enter judgment on this Order.

SO ORDERED.