**NEW YORK STATE ASSOCIATION FOR RETARDED CHILDREN, INC., et al. and Patricia Parisi, et al., Plaintiffs-Appellees,**

v.

**Hugh L. CAREY, individually and as Governor of the State of New York, et al., Defendants-Appellants.**

**United States of America, Amicus Curiae.**

**Nos. 305, 821, Dockets 82–7441, 82–7591.**

United States Court of Appeals, Second Circuit.

Argued Dec. 16, 1982.

Decided March 31, 1983.

Christopher A. Hansen, New York Civil Liberties Union, Robert M. Levy, Diana T. Tanaka, Legal Aid Society, Archibald R. Murray, Kalman Finkel, Paul, Weiss, Rifkind, Wharton & Garrison, Johnathan D. Siegfried, Helen Hershkoff, Elisa M. Rivlin, New York City, Michael S. Lottman, Washington, D.C., Murray B. Schneps, New York City, for plaintiffs-appellees other than New York State Ass'n. for Retarded Children, Inc.

Walter Redfield, New York City, for plaintiff New York State Ass'n for Retarded Children, Inc.

Taylor R. Briggs, LeBoeuf, Lamb, Leiby & MacRae, Richard C. Cole, Kim Hoyt Sperduto, Joy Feigenbaum, Lawrence W. Pol-

lack, Robert Abrams, New York State Atty. Gen., Frederick K. Mehlman, Asst. Atty. Gen., New York City, for defendants-appellants.

Edward R. Korman, U.S. Atty., E.D.N.Y., Wm. Bradford Reynolds, Asst. Atty. Gen., J. Harvie Wilkinson, Deputy Asst. Atty. Gen., Brooklyn, N.Y., Brian K. Landsberg, Louise A. Lerner, Attorneys, Dept. of Justice, Washington, D.C., for amicus curiae U.S.

Before FRIENDLY and NEWMAN, Circuit Judges, and WYZANSKI, District Judge.*

FRIENDLY, Circuit Judge:

The present appeal and a companion case, Docket No. 82–7531, are the latest in a long series of decisions[1] spawned by a complaint filed on March 17, 1972, by the New York State Association for Retarded Children, Inc. (NYSARC), other voluntary organizations, and individual mentally retarded persons on behalf of a class of mentally retarded children and adults residing at what was then Willowbrook State School for the Mentally Retarded and is now Staten Island Developmental Center (Willowbrook), alleging that inhuman conditions there violated constitutional rights protected by 42 U.S.C. § 1983. We provide here only so much background as is necessary to our decision.

## I. FACTUAL BACKGROUND

At the commencement of the action, the resident population of Willowbrook was 5,700, or 65% over its official capacity, reduced from a peak of 6,200 in 1969, and the facility's overcrowding, understaffing, and physical squalor amounted to what one state defendant admitted was a "major tragedy", *NYSARC v. Carey*, 596 F.2d 27, 29–30 (2 Cir.), *cert. denied*, 444 U.S. 836, 100 S.Ct. 70, 62 L.Ed.2d 46 (1979). On April 10,

1973, after five days of hearings and a personal inspection of Willowbrook, the late Judge Orrin G. Judd held that state officials had violated plaintiffs' constitutional right to protection from harm in a state institution, 357 F.Supp. 752, 764–65, and granted preliminary relief ordering immediate hiring of additional staff and improvement of conditions to attain minimal standards of health and safety, *id.* at 768–69. Subsequently plaintiffs, joined by the United States Department of Justice as amicus curiae, moved to have several state officials held in contempt. Settlement negotiations were pursued during a trial on the issue of noncompliance in late 1974 and were resumed in 1975 under a new state administration. These led to the Consent Judgment of April 30, 1975, which Judge Judd approved, 393 F.Supp. 715.

The 1975 Consent Judgment, reproduced at 1 Mental Disability L.Rep. 58 (1976), specified "steps, standards and procedures necessary to secure the constitutional right to protection from harm" for members of plaintiff class, including reduction of Willowbrook's resident population to 250, all remaining residents to be from Staten Island homes,[2] by April 30, 1981. It ordered and enjoined state officials, "[w]ithin their lawful authority" and "subject to any legislative approval that may be required" to "take all actions necessary to secure implementation of" the detailed "steps, standards and procedures" incorporated in a lengthy appendix to the Consent Judgment and to "ensure the full and timely financing of this judgment". Consent Judgment at 3–4. The court created a Review Panel to monitor implementation of the Consent Judgment, as well as a Professional Advisory Board and a Consumer Advisory Board to

---

\* United States District Court for the District of Massachusetts, sitting by designation.

1. Previous reported decisions include *New York State Ass'n for Retarded Children, Inc. v. Rockefeller*, 357 F.Supp. 752 (E.D.N.Y.1973); *New York State Ass'n for Retarded Children, Inc. v. Carey*, 393 F.Supp. 715 (E.D.N.Y.1975); 409 F.Supp. 606 (E.D.N.Y.1976); 438 F.Supp. 440 (E.D.N.Y.1977); 456 F.Supp. 85 (E.D.N.Y. 1978); 466 F.Supp. 479 (E.D.N.Y.1978), *aff'd*, 612 F.2d 644 (2 Cir.1979); 466 F.Supp. 487 (E.D.N.Y.1979); 596 F.2d 27 (2 Cir.), *cert. de-*

*nied*, 444 U.S. 836, 100 S.Ct. 70, 62 L.Ed.2d 46 (1979); 492 F.Supp. 1099 (E.D.N.Y.1980); 492 F.Supp. 1110 (E.D.N.Y.), *rev'd*, 631 F.2d 162 (2 Cir.1980); 544 F.Supp. 330 (E.D.N.Y.1982).

2. This requirement has been elaborated by the Office of Mental Retardation and Developmental Disabilities (OMRDD) into a self-imposed "County of Origin" Policy by which each class member is placed in the borough or county from which he or she was originally committed to Willowbrook.

assist the Review Panel and state administrators. *Id.* at 5–11. The court retained jurisdiction to entertain applications for orders construing, implementing, or enforcing compliance with the provisions of the Consent Judgment. *Id.* at 11–12.

The Consent Judgment ordered that the plaintiff class be provided with "the least restrictive and most normal living conditions possible". Consent Judgment, Appendix A at 1. Included among the requirements implementing this standard were provisions for "clean, adequate and seasonally appropriate clothing", "accessible, private and easily usable toilets and bathing facilities", and "clean, odorless, and insect-free" living quarters. *Id.* at 1–2. Residents were to receive individualized care, opportunities for education and recreation, and adequate medical services. *Id.* at 5–16. Restrictions were placed on use of physical restraints, experimentation on residents, and exaction of residents' labor for the upkeep of the institution. *Id.* at 17–19.

Reduction of Willowbrook's population from 5700 to 250 was to be achieved by relocation of its residents to "community placements" designed "to ready each resident, with due regard for his or her own disabilities and with full appreciation for his or her own capabilities for development, for life in the community at large." *Id.* at 28. A "community placement" was defined in the Consent Judgment as

> a non-institutional residence in the community in a hostel, halfway house, group home, foster care home, or similarly residential facility of fifteen or fewer beds for mildly retarded adults, and ten or fewer beds for all others, coupled with a program element adequate to meet the resident's individual needs.

*Id.* at 27. This restriction placed on the size of community placements, which we shall call for simplicity's sake the "15 bed/10 bed limitation", would contribute to the "normalization" of the lives of plaintiff class members by approximating as nearly as possible the housing situations of non-retarded children and adults.

The road to compliance has not been easy and has by no means reached its end.[3] A prior opinion of this court, 596 F.2d 27, 31–36 (2 Cir.1979), gives a detailed account of the elaborate enforcement mechanisms set up by the district court. From 1975 to 1980, the Willowbrook Review Panel issued periodic audit reports on the degree of compliance with the Consent Judgment and some 25 formal recommendations for the closing of certain facilities, hiring of medical and psychiatric personnel, provision of educational programming, and similar matters. Judge Bartels, succeeding Judge Judd in the case, embodied many of these recommendations in orders to the defendants and conducted hearings on plaintiffs' motions of November 11, 1976, and September 9, 1978, for findings of civil contempt against state officials.

In one such enforcement proceeding, the Willowbrook Review Panel recommended on May 24, 1979, that in order to comply with the Consent Judgment, the defendants should provide a group of multiply handicapped class members transferred to Flower Fifth Avenue Hospital (Flower Hospital) with "community placements" of no more than three beds each. Defendants refused to implement the recommendation unless a court order compelled them to do so. After an evidentiary hearing, "the parties having agreed in open court on September 11, 1979, to a resolution of said issue," the court ordered that the Flower Hospital group be placed in residential facilities of six beds or less, with the more severely disabled half of this group placed in facilities of three beds or less (the "6 bed/3 bed limitation").

The Willowbrook Review Panel has effectively ceased to monitor compliance with the Consent Judgment since the state legislature in March, 1980, refused to appropriate funds necessary to continue its operations. This court subsequently held that the district court could not compel the Governor of New York and its comptroller to reinstate funding for the Review Panel in defiance of the legislature and of state law, 631 F.2d 162, 166 (2 Cir.1980). With the

---

**3.** One rough measure of the time and energy devoted thus far by the parties and the district court to the enforcement of the Consent Judgment is the district court's docket sheet.

Twelve pages of closely typed entries precede the notation of final judgment in 1975; 39 pages follow it.

demise of the Review Panel, counsel for the plaintiff class brought charges of noncompliance directly to the district court's attention. As of August 31, 1981, 1369 members of the original class remained at Willowbrook awaiting placement and 999 had been transferred temporarily to other large institutions. Of the level of sanitation, resident care, and maintenance at Willowbrook revealed by audits in March and September, 1981, we shall have more to say hereafter.

Plaintiffs moved on May 22, 1981, for an order declaring that the defendants were not in compliance with provisions of the Consent Judgment relating to clothing, nutrition, environment, staffing, programs and services, and community placement, and for an order referring further issues of compliance with the Consent Judgment to a Special Master. On the same day, defendants moved pursuant to F.R.Civ.P. 60(b) to modify the 15 bed/10 bed limitation in the Consent Judgment and the 6 bed/3 bed limitation in the Flower Hospital Order to a 50 bed limitation. After extensive discovery and 25 days of testimony, the district court on April 28, 1982, 551 F.Supp. 1165, issued the decision prompting the present appeal.

Judge Bartels, while not doubting "the good faith of the defendants in attempting to comply with the Judgment", Opinion at 1179, found that they had failed to attain its standards for sanitation, maintenance, clothing, programming, special therapies, recreation, nutrition, and staffing. He ordered defendants to comply in these respects "with all deliberate speed", but extended the deadline for finding community placements for plaintiffs to April 1, 1985, Opinion at 1192. The decision further provided that a Special Master be appointed, in place of the defunct Review Panel, to monitor compliance with the Consent Judgment. Finally, Judge Bartels ordered modification of the Flower Hospital Order's 6 bed/3 bed limitation to a 6 bed/4 bed limitation, but denied defendants' motion to modify the 15 bed/10 bed limitation in the Consent Judgment. By order dated July 13, 1982, Judge Bartels named Dr. Rudy Magnone as Special Master and enumerated his duties and powers.

## II. FINDINGS OF NONCOMPLIANCE

Defendants attack the district court's findings of noncompliance with the Consent Judgment on two grounds. First, they charge that the district court's findings were based on inadmissible evidence obtained pursuant to a discovery order so fundamentally unfair to defendants that it amounted to an abuse of the court's discretion. Second, they attack the findings themselves as "clearly erroneous". Neither ground warrants reversal of the district court's findings of noncompliance.[4]

■ The district court's order of July 7, 1981, made over defendants' objection,[5] permitted plaintiffs' counsel, consultants, and experts to inspect the Willowbrook facilities, "take photographs, make observations, take notes, form conclusions and interview any class member, staff member or employee desired outside the presence of defendants," their counsel and representatives.[6] Plaintiffs' representatives were instructed to minimize disruption of defendants' operation and to limit the number of observers on any one inspection to four. Defendants were instructed to allow their employees to answer all questions put to them by the visitors. Defendants now charge that as a result of this order, hearsay statements of unidentified Willowbrook staff members, unsubstantiated observations of plaintiffs'

4. Appellants do not challenge this portion of the judgment on the basis of the Supreme Court's decision in *Youngberg v. Romeo*, 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28, decided on June 18, 1982, subsequent to the district court's decision. We discuss the effect of *Youngberg* below.

5. At the hearing on plaintiffs' motion for the discovery order, defendants objected especially to plaintiffs' counsel questioning defendants'

employees without defendants' counsel present. The circumstances here, however, are similar to those in *Vega v. Bloomsburgh*, 427 F.Supp. 593, 595 (D.Mass.1977), wherein this practice was approved.

6. Plaintiffs pointed out at the hearing that similar discovery orders were granted by Judge Johnson in *Wyatt v. Hardin*, C/A No. 3195–N (M.D.Ala., June 21, 1978).

expert witnesses, and prejudicial photographs were admitted into evidence and were expressly relied upon in the district court opinion.[7]

In challenging the propriety of the discovery order, defendants rely principally on *Belcher v. Bassett Furniture Industries, Inc.,* 588 F.2d 904 (4 Cir.1978), an employment discrimination case in which an order permitting inspection of defendant's plant and questioning of its employees by the plaintiff's expert was reversed. That decision correctly states the standard to be used in deciding whether, under F.R.Civ.P. 26(c), a discovery order such as this one is unduly burdensome: "Under this subsection, the degree to which the proposed inspection will aid in the search for truth must be balanced against the burdens and dangers created by the inspection." 588 F.2d at 908. The danger, there as here, was that "interrogation of the employees, conducted informally" could amount to "a roving deposition, taken without notice, throughout the plants, of persons who were not sworn and whose testimony was not recorded, and without any right by the defendant to make any objection to the questions asked. Presumably, on the basis of such interrogations, the expert would base his testimony." *Id.* at 907. The Fourth Circuit found that this danger, combined with the burden of disruption of defendant's operations, outweighed the speculative gains to be derived, in light of the facts that the complaint in *Belcher* had alleged no specific instances of discrimination, the motion for the discovery order mentioned no specific areas of inquiry, and the expert witness's special field of expertise was not described.

A different balance must be struck in the present case. Here plaintiff counsel's claims of noncompliance were quite specific and their inspections were meant to fill a gap left by the demise of the Review Panel provided for in the Consent Judgment.

Judge Bartels, calling on his years of experience with the case, was well able to determine the value this form of discovery would have in resolving the controversy then before him. In many respects the inspection procedure here resembles the placement of experts within Texas Youth Council facilities permitted in *Morales v. Turman,* 59 F.R.D. 157, 159 (E.D.Tex.1972). Mindful of the unique difficulties presented in postjudgment compliance efforts of the sort here in question, we do not consider the district court's discovery order of July 7, 1981, to have been an abuse of discretion. Almost all the out-of-court statements by unnamed Willowbrook employees provisionally admitted were received for the purpose of enabling plaintiffs' experts to express an opinion as permitted by F.R.E. 703. Moreover, the eyewitness observations to which plaintiffs' experts testified and the documentary and photographic exhibits afforded ample basis for the district court's findings.

Defendants further attempt to show that the findings of noncompliance in Judge Bartels' Opinion and Order of April 28, 1982, (Opinion), 551 F.Supp. 1165, were clearly erroneous. They do this in the face of a Compliance Report (Report) prepared by defendant officials of OMRDD in March 1981 admitting noncompliance with 137 of 385 standards embodying the mandates of the Consent Judgment. Report at 15. Details of these findings and defendants' charges of error follow.

Judge Bartels found that "sanitation at Willowbrook is totally unsatisfactory and presents a serious health hazard to the resident population." Opinion at 1170. Rodents and cockroaches infest the kitchens and dining rooms. Human feces and urine pollute bathrooms and living areas. The district judge also found that "[t]he most glaring maintenance inadequacies," included blocked plumbing, broken furniture, and

---

7. Defendants object particularly to a footnote in Judge Bartels' opinion, n. 10, mentioning that Dr. Clements observed in the lunchroom a class member sitting in a puddle of urine and testified to an out-of-court statement by an unnamed employee that it was not her job to clean up urine. Dr. Clements then saw the class member drop his spoon into the puddle, retrieve it, and continue to eat. It is clear, however, that Judge Bartels relied not upon the truth of the hearsay statement but upon Dr. Clements' observation that while he was in the lunchroom the employee noticed the situation and did nothing to remedy it.

lack of curtains for privacy, "stem from present, not past neglect." Opinion at 1171. Defendants argue that the judge should have ignored testimony of Willowbrook Review Panel chairman Dr. James Clements and plaintiffs' photographic evidence in favor of his own observations during a tour of Willowbrook on the first day of trial. We find no error in the district court's reliance on the repeated visits of Dr. Clements. Defendants' own Compliance Report revealed noncompliance with 22 of 39 applicable standards in this area, including those specifying absence of "offensive, irritating odors" and of food, dirt, and trash of more than one day's accumulation. Report at 41–42.

Judge Bartels found that "[s]ome residents at Willowbrook are partially clothed, others go nude, and many wear clothes that are ill-fitting, badly torn and stained." Opinion at 1172. The court noted that toilet training of class members cannot proceed when they are pinned or tied into their clothing and thus cannot remove it themselves. Defendants point to testimony describing improvements in this area but, despite these hopeful signs, their Compliance Report records that the clothing supply is insufficient and that clothes are frequently ill-fitting and in disrepair. Report at 10.

Delivery of programming, that is, formal training or instruction for the mentally retarded person's individual needs, was found seriously deficient. Some residents, due to lack of transportation or lack of clothing, never arrive at their programming sessions. Even for those residents who attend, the court found, "[d]efendants have been remiss in developing and implementing individual development treatment plans." Opinion at 1174. Here conflicting expert testimony permitted the court to conclude, in accordance with defendants' Compliance Report, that "[m]any recommended programs and services ... were not being implemented"; residents instead "were observed sitting inactively in program areas." Report at 6.

Defendants on appeal do not mention the court's findings on the absence and misuse of equipment for residents requiring special therapies, enforced idleness due to lack of any recreation equipment, and failure to provide special diets for residents who need them. Opinion at 1174–1175. Defendants do, however, contest vigorously Judge Bartels' finding of "serious staff shortages" due to chronic tardiness, absences, and inefficient deployment of what would otherwise be adequate numbers of employees. Opinion at 1176. Defendants insist that the court improperly relied upon plaintiffs' figures based on worksheets that did not provide complete records of staff attendance. Yet defendants' February 1981 Compliance Report on staffing (Staff Report) revealed the same conclusions. Full compliance could be shown among direct staff, at least on weekdays, when all buildings and shifts were averaged, but "the range of surpluses and deficits varied considerably among buildings." Staff Report at 2. Among mid-level supervisors, even the average attendance in all buildings of the Willowbrook facility during all shifts, including paydays, did not amount to full compliance. Staff Report at 3. Neither this nor any of the findings previously mentioned constitutes the clear error that would be required for us to reverse the judge's findings on conditions at Willowbrook.

### III. APPOINTMENT OF A SPECIAL MASTER

■ Defendants seek to have the district court's appointment of a special master set aside as an abuse of discretion. Their argument that the present case fails to show the requisite "exceptional condition" under F.R. Civ.P. 53(b) is wholly lacking in merit. The monitoring of a Consent Judgment that mandates individualized care for thousands of class members and that entails balancing of the interests of parties with third-party employees,[8] school authorities,[9] and commu-

---

8. See *NYSARC v. Carey,* 438 F.Supp. 440 (E.D. N.Y.1977) (joining the Civil Service Employees Association, Inc. for an ancillary proceeding determining whether a proposed contract between the Department of Mental Hygiene and United Cerebral Palsy "would infringe on any

rights of the employees at Willowbrook"); 456 F.Supp. 85 (E.D.N.Y.1978) (concluding the ancillary proceeding).

9. See *NYSARC v. Carey,* 466 F.Supp. 479 (E.D. N.Y.1978) (enjoining city board of education

nity groups [10] is just the sort of "polycentric problem that cannot easily be resolved through a traditional courtroom-bound adjudicative process" for which Judge Weinstein found a Special Master appropriate in *Hart v. Community School Bd. of Brooklyn,* 383 F.Supp. 699, 766 (E.D.N.Y.1974), aff'd, 512 F.2d 37 (2 Cir.1975). See also *Gary W. v. Louisiana,* 601 F.2d 240, 244–45 (5 Cir. 1979); *Halderman v. Pennhurst State School & Hospital,* 612 F.2d 84, 111 (3 Cir. 1979) [11] and cases cited in these opinions.

Underlying defendants' objection to the appointment is the apprehension that the Special Master would become Willowbrook's *de facto* administrator, intervening at every decision-making stage and rewarding the exposure of deficiencies in ways that would be disastrous to staff morale. An order appointing a special master to oversee a city's compliance with the Fair Housing Act, a remedy opposed by defendants and plaintiffs, was reversed in *United States v. City of Parma,* 661 F.2d 562, 579 (6 Cir. 1981), cert. denied, 456 U.S. 926, 102 S.Ct. 1972, 73 L.Ed.2d 1309 (1982), on the ground of intrusiveness. The limited powers of this Special Master, as set forth in Judge Bartels' Order of July 13, 1982, assure that this spectre of usurpation is unlikely to materialize.

Provisions of the July 13, 1982, Order allowing the Master access to Willowbrook records and buildings, permitting him to interview class members and defendants' employees, requiring his staff to compile periodic reports on compliance, and permitting inspection and copying of such reports by all parties, Order at 3–4, are taken practically word-for-word from the powers and duties of. the Review Panel set forth in the 1975 Consent Judgment at 7, as is the provision punishing as contempt of court any interference with the Special Master or his staff by any person with notice of the Order. The Order also reproduces the mechanism by which the Review Panel made recommendations regarding compliance with or interpretation of the Consent Judgment, which became binding on all parties unless written objections are filed seeking resolution by the court. Order at 4–5; Consent Judgment at 9. As this court stated in an earlier opinion dealing with Willowbrook, "the parties knowingly and intentionally delegated to a panel of chosen experts the power to make the initial determination on important matters involving the meaning and interpretation of the Consent Judgment", 596 F.2d at 32–33. "[T]hey created continually evolving enforcement and supervisory mechanisms" thought necessary to "meet evolving conditions and to resolve differences", id. at 37. The powers of the Special Master to inspect, to interview, and to make recommendations go no further than those agreed to in the Consent Judgment.

Other powers and duties of the Special Master are more narrowly circumscribed than those previously possessed by the Review Panel. The Special Master is directed to review, integrate, and harmonize the audits conducted by the many existing monitoring groups, Order at 3, and may require the defendants to submit "any reports necessary to assist the Master in performing his duties", Order at 4, but he and his staff do not have the Review Panel's blanket power to "conduct any additional inquiries

from excluding mentally retarded children from regular school classes because they carried serum hepatitis), aff'd, 612 F.2d 644 (2 Cir.1979).

10. See, e.g., *People of the State of New York v. 11 Cornwell Co.,* 695 F.2d 34 (2 Cir., 1982) (state suit on behalf of its mentally retarded citizens against partnership formed by neighbors seeking to prevent OMRDD from purchasing house as community residence for the retarded).

11. We are mindful of Justice White's disapproval of use of a Special Master in the *Pennhurst* proceeding "to decide which of the Pennhurst inmates should remain and which should be moved to community-based facilities", *Pennhurst State School v. Halderman,* 451 U.S. 1, 54, 101 S.Ct. 1531, 1558, 67 L.Ed.2d 694 (1981) (White, J., dissenting in part). A decision presenting that issue is now before the Supreme Court, *Halderman v. Pennhurst State School & Hospital,* 673 F.2d 647 (3 Cir.) (en banc) (reinstating judgment on state law grounds), cert. granted, 457 U.S. 1131, 102 S.Ct. 2956, 73 L.Ed.2d 1348 (1982). The Special Master in this case has power to monitor and to make recommendations concerning placement of individuals, but is not given power to decide.

they deem necessary or appropriate." Consent Judgment at 8. The Order contemplates a role for the Special Master at once less formal and more facilitative than that of the former Review Panel. While the Consent Judgment placed little emphasis on the Review Panel's power to make "informal suggestions", Consent Judgment at 8, the Order in several of its provisions directs the Special Master to provide assistance and advice to the parties, report to the parties, consult with the parties informally, and conduct informal working sessions. Order at 4–5, 7. Correspondingly, "[d]efendants and all of their agents, as well as public agencies of the State of New York, are directed to cooperate fully with the Master in order to accomplish the purposes of this order". *Id.* at 8. The following provision of the Order had no counterpart in the Consent Judgment:

> The Master shall have no authority to exercise any control or management over the operation of any facility operated or licensed by the State of New York, but he shall have authority to monitor the location and acquisition of community placement facilities in order to meet the placement goals of the Consent Judgment, and to make a report to the parties with respect thereto.

The powers granted to the Special Master here comport with those granted in similar cases by other courts. See *Gary W., supra,* 601 F.2d at 245 and cases cited therein. As limited by the letter and spirit of Judge Bartels' Order of July 13, 1982, the Special Master's role does not threaten usurpation of state functions.[12]

What we have said largely answers the appellants' arguments on this aspect of the case based on *Youngberg v. Romeo,* 457

U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28, decided by the Supreme Court on June 18, 1982, nearly two months after the decision here. That case, as it reached the Supreme Court on certiorari to the Third Circuit, 644 F.2d 147, was a suit for damages under 42 U.S.C. § 1983 against Pennsylvania state officials by a retarded man who, at his mother's request, had been committed to the Pennhurst State School and Hospital. The damages sought were for injuries received as a result of Romeo's own violence and the reactions of other residents to him, for unduly prolonged physical restraints, and for failure to provide Romeo with appropriate treatment for his mental retardation. The Court upheld Romeo's claims to safe conditions and to freedom from unnecessary bodily restraints. It found his claim to a "constitutional right to minimally adequate habilitation" to be "more troubling", 457 U.S. at 316, 102 S.Ct. at 2458, 73 L.Ed.2d at 37. Because of what it thought to be a disavowal of broader claims, at 318 & n. 23, 102 S.Ct. at 2459 & n. 23, 73 L.Ed.2d at 38–39 & n. 23, the Court considered that Romeo was asserting only a constitutional right to "minimally adequate or reasonable training to ensure safety and freedom from undue restraint." At 319, 102 S.Ct. at 2460, 73 L.Ed.2d at 39. It sustained this claim and, because of the disavowal, found it unnecessary to consider "the difficult question whether a mentally retarded person, involuntarily committed to a state institution, has some general constitutional right to training per se, even when no type or amount of training would lead to freedom." *Id.* However, in what for us is the most important passage in the opinion, the Court endorsed the standard articulated by Chief Judge Seitz of the Third Circuit as that to be applied in reviewing state action

---

**12.** Defendants also contend that the provision of Judge Bartel's Order which taxes them with the necessary expenses for carrying out the Special Master's duties, Order at 6, violates principles of federalism. The appointment of a Special Master clearly was meant to fill the void left by the state legislature's refusal to fund the Willowbrook Review Panel, which the district court was powerless to undo. See *NYSARC v. Carey,* 631 F.2d 162 (2 Cir.1980). This fact does not itself detract from the legitimacy of the district court's allocation of costs

to defendants under F.R.Civ.P. 53(a). See *Gary W., supra,* 601 F.2d at 245–46; *Morgan v. Kerrigan,* 530 F.2d 401, 427 (1 Cir.), *cert. denied,* 426 F.2d 935 (1976). See also *Halderman v. Pennhurst State School & Hospital,* 526 F.Supp. 428 (E.D.Pa.1981) (proceeds from contempt fines paid to special master). The federal court in awarding costs may treat the state "like any other litigant", *Hutto v. Finney,* 437 U.S. 678, 696, 98 S.Ct. 2565, 2576, 57 L.Ed.2d 522 (1978).

for the protection of the involuntarily committed. This was that, 644 F.2d at 178:

> the Constitution only requires that the courts make certain that professional judgment in fact was exercised. It is not appropriate for the courts to specify which of several professionally acceptable choices should have been made.

Justice Powell went on to say, at 322–323, 102 S.Ct. at 2461–2462, 73 L.Ed.2d at 41–42:

> In determining what is "reasonable"—in this and in any case presenting a claim for training by a state—we emphasize that courts must show deference to the judgment exercised by a qualified professional. By so limiting judicial review of challenges to conditions in state institutions, interference by the federal judiciary with the internal operations of these institutions should be minimized. Moreover, there certainly is no reason to think judges or juries are better qualified than appropriate professionals in making such decisions.... For these reasons, the decision, if made by a professional, is presumptively valid; liability may be imposed only when the decision by the professional is such a substantial departure from accepted professional judgment, practice or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment.

We are unable to agree with appellants that *Youngberg* automatically leads to reversal of what would otherwise have been an appropriate exercise of the judge's discretion to appoint a Special Master. What it does do is supply a standard that will be relevant to any further attempts that might be made to modify the terms of the consent decree, as we hold it to be with respect to this one. To the extent that the decree leaves room for interpretation, that standard will also have relevance for the Special Master in making recommendations and for the district court in ruling upon them. Time may show that because of *Youngberg's* restrictive effect upon the scope of the review, the Special Master is unnecessary. In that event the defendants are free to move that the appointment be terminated.

## IV. MODIFICATION OF THE CONSENT JUDGMENT

Although we have rejected the foregoing challenges to the action of the district court, we take a different view with respect to its refusal to modify the Consent Judgment's 15 bed/10 bed limitation on the size of community placement facilities for the Willowbrook class and to do more than slightly modify its Flower Hospital Order from a 6 bed/3 bed limitation to one of 6 bed/4 bed.

At the hearing before the district court, defendants made a strong showing that only by modifying the 15 bed/10 bed limitation to one of community placements up to 50 beds in size [13] could they expeditiously relocate the remaining 1369 residents of Willowbrook and the 999 class members temporarily residing in other large institutions. They presented testimony of state officials and expert witnesses that some class members would be better cared for and better adjusted in facilities of intermediate size. Defendants also showed that the 6 bed/3 bed limitation on placements for the multiply handicapped residents of Flower Hospital effectively denied those individuals the proper medical supervision they require.

In the first place, New York City's extremely tight housing market has slowed down OMRDD's placement of class members in community residences within their home boroughs. OMRDD's past and present directors of community placement testified to the difficulties encountered in finding residences of more than 3 or 4 beds in the city and the greatly increased costs per class member when residences of such small size are acquired and adapted for mentally retarded persons. To obtain community placements of 8 to 10 beds, OMRDD often must purchase vacant sites that could

---

13. If modification were granted, OMRDD proposed to construct in fiscal year 1983:
   18 community residences of 4–10 beds each;
   15 residences of 11–24 beds each;
   2 residences of 25–34 beds each; and
   3 residences of 35–50 beds each.
   Defendants' Post-Trial Memorandum at 85–86.

accommodate group homes above the 15 bed/10 bed limit at little additional cost.

Some of the placement difficulties encountered by defendants can be traced to the time-consuming procedures for dealing with neighborhood opposition, see note 9, *supra*, under New York Mental Hygiene Law § 41.34 (McKinney Supp. 1982–83). Another obstacle, defendants' "County of Origin" policy of relocating most Willowbrook residents in the boroughs in which their families still reside, represents a further attempt to defuse neighborhood opposition to "outsiders". Finally, OMRDD has had to rule out many 3 to 4 bed apartments because in order to qualify for federal Medicaid contributions, community facilities housing individuals incapable of responding to emergency situations must be adapted to meet the National Fire Protection Association Life Safety Code, 42 C.F.R. 442.507–442.508 (1981).

The district court took "judicial notice of the current housing shortage in New York City" as a temporary phenomenon but found that "this year 57 new community residences designed to accommodate approximately 450 persons will become available in the New York City area alone, and another 88 units, housing approximately 700 persons, are anticipated for fiscal year 1982–83", Opinion at 1188. The court based its finding on testimony of OMRDD Special Assistant Cora Hoffman and Facilities Development Corporation employee Edward R. Matthews that some 80 sites were "in the pipeline" for the coming year. In response to questioning by the court, however, Hoffman explained that sites "in the pipeline" had been located but had not been approved or acquired. "Some of them," she stated, probably more than half, "we won't ever get". This evidence did not warrant the district court's converting OMRDD's sanguine hopes into realizable facts.

Judge Bartels also found that delays and abandonment of placement sites due to compliance with the "County of Origin" policy, New York Mental Hygiene Law § 41.34, and the federal Life Safety Code were among the "self-imposed" obstacles making defendants' placement difficulties largely a problem of their own creation. By adopting this perspective, however, the district court lost sight of the interests of third parties and the complex environment in which OMRDD must operate. On a less narrow and adversarial view of the evidence, OMRDD's difficulties in stemming neighborhood resistance and securing federal funding take on a real and formidable aspect.

Next to be mentioned is the plethora of expert testimony on the size of the residential facility as a factor bearing on the care received by mentally retarded persons and their opportunities for development. Defendants produced OMRDD Acting Commissioner Sygmond Slezak, New York State Department of Social Services Commissioner Barbara Blum, former Willowbrook Director of Medical Services Dr. Philip Ziring, Associate Director of the Illinois Department of Developmental Disabilities Dr. Richard Blanton, Harvard Psychiatry Professor and former Texas Commissioner of Mental Retardation Dr. Shervert Frazier, Boston University Professor of Special Education Dr. Sue Allen Warren, and Marc Brandt of the Sullivan County Association for Retarded Children, all of whom were in general agreement that a range of facilities of different sizes up to 50 beds would best serve the Willowbrook class. The quality of care and relationships between staff and residents, it was testified, would not suffer in facilities of larger size. Moreover, community placements of less than 10 beds, according to Dr. Ziring and Dr. Frazier, could not each be staffed with physicians and therapists necessary for disabled class members and those with special health risks. In particular, Dr. Ziring considered that the limited access to proper medical care that multiply handicapped residents of Flower Hospital would have in community placements of 3 to 6 beds would amount to "malpractice."

Against this testimony, plaintiffs' and amicus curiae's expert witnesses, including

Massachusetts Assistant Commissioner for Mental Retardation Kathleen Schwaninger, Arizona Assistant Deputy Director Brian Lensink, Chairman of the Willowbrook Review Panel Dr. James Clements, University of Alabama Professor of Medicine Dr. Andrew Lorincz, and Gerald Provencal and Lyn Rucker, both of whom run small group homes in other states, joined in contending that the size of a residential facility is the single most important factor in the development of mentally retarded individuals. Facilities of 10 beds or less, these experts testified, provide consistency of programming and care as well as the warmth of personal relationships. Plaintiffs' medical experts concluded that the medical problems of Willowbrook class members were exaggerated by defendants' experts. Even the Flower Hospital residents, according to Dr. Lorincz, were medically stable and posed no risks that adequately trained staff could not handle.

The district court rejected the evidence of defendants' witnesses and remained convinced "that the needs of the Willowbrook class members are better met in small group homes than in facilities ranging in size from 11 to 50 beds", Opinion at 1184.[14] The court noted that defendants had agreed in 1975 to the 15 bed/10 bed limitation and thus would have to argue "either that professional knowledge has changed or that practical experience has shown that the quality of care is the same in facilities sized from 1 to 50 residents", Opinion at 1184. In so holding, the district court allowed one provision of the Consent Judgment, that requiring 15 bed/10 bed community placements, to override the more comprehensive goal of transferring the population of Wil-

lowbrook, whose squalid living conditions this court has already recited, to facilities of more human dimension as quickly as possible.

■ An injunction, as a final judgment with prospective application, may be modified by the court upon motion by a party and a showing that continuation of the injunction would be inequitable. F.R.Civ.P. 60(b)(5) expressly authorizes a district court to relieve a party from a final judgment if "it is no longer equitable that the judgment should have prospective application." The power of a court of equity to modify a decree of injunctive relief is long-established, broad, and flexible. "A continuing decree of injunction directed to events to come is subject always to adaptation as events may shape the need.... The distinction is between restraints that give protection to rights fully accrued upon facts so nearly permanent as to be substantially impervious to change, and those that involve the supervision of changing conduct or conditions and are thus provisional and tentative.", *United States v. Swift & Co.,* 286 U.S. 106, 114, 52 S.Ct. 460, 462, 76 L.Ed. 999 (1932) (Cardozo, J.). "Familiar equity procedure assures opportunity for modifying or vacating an injunction when its continuance is no longer warranted", *Milk Wagon Drivers Union v. Meadowmoor Dairies,* 312 U.S. 287, 298, 61 S.Ct. 552, 557, 85 L.Ed. 836 (1941) (Frankfurter, J.).

In denying defendants' motion for modification of the limitation on the size of community placement facilities, Judge Bartels relied on other language of Justice Cardozo in *United States v. Swift & Co., supra,*

14. One of the reasons given by the district court for rejecting defendants' expert testimony was defendants' failure to identify specific individuals within the Willowbrook class whose medical or developmental needs would be better served by placement in facilities of 11 to 50 beds, Opinion at 1186 & n. 27. With so many other problems pressing, defendants could not fairly be expected to devote time and resources to an assessment of the adaptability of several thousand individuals to facilities of a size defendants were yet barred from employing. The modification requested by defendants would not relieve them of the further duty imposed by the Consent Judgment to evaluate "the community alternative best suited for each resident".

286 U.S. at 119, 52 S.Ct. at 464, quoted here *in extenso:*

> There is need to keep in mind steadily the limits of inquiry proper to the case before us. We are not framing a decree. We are asking ourselves whether anything has happened that will justify us now in changing a decree. The injunction, whether right or wrong, is not subject to impeachment in its application to the conditions that existed at its making. We are not at liberty to reverse under the guise of readjusting. Life is never static, and the passing of a decade has brought changes to the grocery business [the subject of the decree] as it has to every other. The inquiry for us is whether the changes are so important that the dangers, once substantial, have become attenuated to a shadow. No doubt the defendants will be better off if the injunction is relaxed, but they are not suffering hardship so extreme and unexpected as to justify us in saying that they are the victims of oppression. Nothing less than a clear showing of grievous wrong evoked by new and unforeseen conditions should lead us to change what was decreed after years of litigation with the consent of all concerned.

This apparent hardening of the usual standard for modifying decrees of injunctive relief did not stem from the fact that in *Swift* the Court was dealing with a consent decree. Justice Cardozo explicitly ruled that "[t]he result is all one whether the decree has been entered after litigation or by consent" and rejected the argument that for purposes of modification by the Court, "a decree entered upon consent is to be treated as a contract and not as a judicial act. . . . The consent is to be read as directed toward events as they then were. It was not an abandonment of the right to exact revision in the future, if revision should become necessary in adaption to events to be", 286 U.S. at 114, 115, 52 S.Ct.

at 462.[15] Rather, the considerations underlying the language just quoted from *Swift* were based on the specific facts then before the Court.

The consent decree at issue in *Swift* had been entered into by the United States and five major meatpackers in February, 1920, enjoining the meatpackers from violating the antitrust laws and from holding any interest in several lines of business, including the wholesale and retail provision of other foodstuffs such as fish, vegetables, fruit and groceries, as to which the market power arising from defendants' domination of the meatpacking business was thought to give them unfair competitive advantages and to encourage practices violative of the antitrust laws, 286 U.S. at 111, 115–16, 52 S.Ct. at 461, 462–63. The ink had hardly become dry on the decree when the meatpackers began to assail it, see *Swift & Co. v. United States,* 276 U.S. 311, 48 S.Ct. 311, 49 L.Ed. 518 (1928); *United States v. California Cooperative Canneries,* 279 U.S. 553, 555, 49 S.Ct. 423, 424, 73 L.Ed. 838 (1929), the latter of which attempts led to a suspension of the decree for several years. Not daunted by the adverse results in these cases, several of the meatpackers within a year sought major modification in the decree, which the lower court granted to the extent of eliminating the prohibitions mentioned above. The modification on which the Supreme Court passed in *Swift* would have robbed the 1920 consent decree of so much of its force that the Court considered it "revers[al] under the guise of readjusting", 286 U.S. at 119, 52 S.Ct. at 464.

The *Swift* decision was analyzed by the Supreme Court in *Chrysler Corp. v. United States,* 316 U.S. 556, 562, 62 S.Ct. 1146, 1149, 86 L.Ed. 1668 (1942) and, more particularly, in *United States v. United Shoe Machinery Corp.,* 391 U.S. 244, 88 S.Ct. 1496, 20 L.Ed.2d 562 (1968). There the United States, rather than the defendant, sought

---

**15.** This position was reaffirmed in *System Federation v. Wright,* 364 U.S. 642, 650–52, 81 S.Ct. 368, 372–73, 5 L.Ed.2d 349 (1961). Resort to a contractual analogy would be particularly inappropriate in the present case. This court

has noted in a previous decision with respect to Willowbrook that even for purposes of interpretation, the "Consent Judgment is no mere contract," 596 F.2d at 37.

modification of an antitrust decree. The district court read *Swift* as limiting its power to modify to cases involving "(1) a clear showing of (2) grievous wrong (3) evoked by new and unforeseen conditions", 226 F.Supp. 328, 330 (D.Mass.1967). The Supreme Court held the district court had read *Swift* too rigidly. The language we have quoted *in extenso* must, the Court said, be read in the light of context. "*Swift* teaches that a decree may be changed upon an appropriate showing, and it holds that it may *not* be changed in the interest of the defendants if the purposes of the litigation as incorporated in the decree (the elimination of monopoly and restrictive practices) have not been fully achieved." 391 U.S. at 248, 88 S.Ct. at 1499 (emphasis in original).

Our case differs from both *Swift* and *United Shoe Machinery.* Here, as in *Swift,* the modification is proposed by the defendants. But it is not, as in *Swift,* in derogation of the primary objective of the decree, namely, to empty such a mammoth institution as Willowbrook; indeed defendants offered substantial evidence that, again in contrast to *Swift,* the modification was essential to attaining that goal at any reasonably early date. To be sure, the change does run counter to another objective of the decree, namely, to place the occupants of Willowbrook in small facilities bearing some resemblance to a normal home, but any modification will perforce alter some aspect of the decree. An analogy closer than either *Swift* or *United Shoe* is *King-Seeley Thermos Co. v. Aladdin Industries, Inc.,* 418 F.2d 31 (2 Cir.1969). We there considered a district court's refusal to modify a 1962 consent decree between two manufacturers regarding use by one, Aladdin Industries, of the generic term "thermos" in labels and advertising. Aladdin had sought modification of the decree insofar as it applied to advertising. We noted that the heavy burden applied in *Swift* must be read in the

context of that case, in which, for reasons previously outlined, the meatpackers were obliged "to stake their claim on drastic changes in conditions", 418 F.2d at 34. When a case involves drawing the line between legitimate interests on each side, modification will be allowed on a lesser showing:

> While changes in fact or in law afford the clearest bases for altering an injunction, the power of equity has repeatedly been recognized as extending also to cases where a better appreciation of the facts in light of experience indicates that the decree is not properly adapted to accomplishing its purposes.

418 F.2d at 35. We therefore remanded in *King-Seeley* for consideration whether, "in the light of experience, the detailed provisions of the decree seriously and needlessly impeded [Aladdin's] exploitation of the generic term and that modification was necessary to achieve the results intended, even though this would take the form of reducing the restrictions imposed upon it", *id.* See also *SEC v. Warren,* 583 F.2d 115, 119– 20 (3 Cir.1978) (commentary on *Swift* and *King-Seeley* ).[16]

Two other considerations reinforce our conclusion that the district court imposed far too drastic a standard upon defendants' request for modification. It is well recognized that in institutional reform litigation such as this judicially-imposed remedies must be open to adaptation when unforeseen obstacles present themselves, to improvement when a better understanding of the problem emerges, and to accommodation of a wider constellation of interests than is represented in the adversarial setting of the courtroom. In one of the earliest scholarly explications of institutional reform litigation, Professor Abram Chayes recognized as its most important characteristic that "the trial judge has increasingly become the creator and manager of com-

---

**16.** Some cases have steadfastly hewed to the *Swift* line. See, *e.g., Humble Oil & Refining Co. v. American Oil Co.,* 405 F.2d 803, 813 (8 Cir.) (Blackmun, J.), *cert. denied,* 395 U.S. 905, 89 S.Ct. 1747, 23 L.Ed.2d 218 (1969); *United States v. Work Wear Corp.,* 602 F.2d 110, 112 n. 6 (6 Cir.1979); *Holiday Inns, Inc. v. Holiday Inn,* 645 F.2d 239, 240 (4 Cir.), *cert. denied,* 454

U.S. 1053 (1981); *Roberts v. St. Regis Paper Co.,* 653 F.2d 166, 174 (5 Cir.1981).

Other circuits have distinguished the *Swift* standard in different ways. See *Tobin v. Alma Mills,* 192 F.2d 133, 136–37 (4 Cir.1951); *United States v. City of Chicago,* 663 F.2d 1354, 1359–60 (7 Cir.1981) (en banc).

plex forms of ongoing relief, which have widespread effect on persons not before the court and require the judge's continuing involvement in administration and implementation", Chayes, The Role of the Judge in Public Law Litigation, 89 Harv.L.Rev. 1281, 1284 (1976).[17] A principal advantage of the use of injunctive relief in such cases, Chayes added, is that "[o]ver time, the parties may resort to the court for enforcement or modification of the original order in light of changing circumstances", id. at 1292.

As experience with this type of litigation increases, a consensus is emerging among commentators in favor of modification with a rather free hand. According to one, the judge who declines to remain involved and to respond flexibly will fail to "respond to the need, present in most institutional reform cases, for phased implementation and small alterations in strategic objectives as new knowledge is acquired", Note, Implementation Problems in Institutional Reform Litigation, 91 Harv.L.Rev. 428, 436 (1977).[18] Another states that "[g]iven the detail of these decrees and the lack of judicial expertise, substantive modification and adjustment are unavoidable and should willingly be undertaken", Special Project, The Remedial Process in Institutional Reform Litigation, 78 Colum.L. Rev. 784, 818 (1978). Another observer notes that "[i]mplementation is an incremental, cyclical process of small steps, each followed by assessment or reaction and further adjustment. Courts must revise decrees repeatedly to cover unforeseen impediments or adverse consequences", Diver, The Judge as Political Powerbroker: Superintending Structural Change in Public Institutions, 65 Va.L.Rev. 43, 63 (1979). See also Fletcher, The Discretionary Constitu-

tion: Institutional Remedies and Judicial Legitimacy, 91 Yale L.J. 635, 640 (1982). The best statement we have found with respect to the appropriate legal standard for evaluating a defendant's motion for modification of a consent judgment in institutional reform litigation is that of Professor Owen Fiss:

> The judge must search for the "best" remedy, but since his judgment must incorporate such open-ended considerations as effectiveness and fairness, and since the threat and constitutional value that occasions the intervention can never be defined with great precision, the intervention can never be defended with any certitude. It must always be open to revision, even without the strong showing traditionally required for modification of a decree, namely, that the first choice is causing grievous hardship. A revision is justified if the remedy is not working effectively or is unnecessarily burdensome. [Citation omitted.]

Fiss, The Supreme Court—1978 Term— Foreword: The Forms of Justice, 93 Harv. L.Rev. 1, 49 (1979). This view has found judicial expression in *Philadelphia Welfare Rights Organization v. Shapp*, 602 F.2d 1114, 1120–21 (3 Cir.1979), *cert. denied*, 444 U.S. 1026, 100 S.Ct. 689, 62 L.Ed.2d 660 (1980). Faced with "a complex ongoing remedial [consent] decree", the Third Circuit upheld a modification sought by the defendants, saying:

> Where an affirmative obligation is imposed by court order on the assumption that it is realistically achievable, the court finds that the defendants have made a good faith effort to achieve the object by the contemplated means, and the object nevertheless has not been fully achieved, clearly a court of equity has

---

**17.** Professor Chayes has recently reaffirmed his view that injunctions in institutional reform cases "are not so much peremptory commands to be obeyed in terms, as they are future-oriented plans designed to achieve broad public policy objectives in a complex, ongoing fact situation", Chayes, The Supreme Court—1981 Term —Foreword: Public Law Litigation and the Burger Court, 96 Harv.L.Rev. 4, 56 (1982).

**18.** This commentator goes so far as to suggest that full compliance with the court's decree as

it is initially framed will rarely be achieved. *Id.* at 431. The writer's conclusion is that:

> when a court determines that the vindication of legal rights of mental patients requires a mental health system to triple its budget, double its staff, reduce its institutional population by seventy percent, and restructure internal administrative patterns and interagency relationships in a few years ... success on all fronts should not be expected. *Id.* at 434.

power to modify the injunction in the light of experience. Applications to modify a decree such as that in this case should thus be viewed with generosity.

■ Here especially great generosity is mandated by the decision in *Youngberg* which we have discussed above. In *System Federation No. 91 v. Wright,* 364 U.S. 642, 81 S.Ct. 368, 5 L.Ed.2d 349 (1961), the Supreme Court held that a consent decree prohibiting certain acts must be modified when the statutory requirement on which the decree was based was amended so as to permit them. Justice Harlan noted that "the District Court's authority to adopt a consent decree comes only from the statute which the decree is intended to enforce"; hence the court must "be free to modify the terms of a consent decree when a change in law brings those terms in conflict with statutory objectives", 364 U.S. at 651, 81 S.Ct. at 373. Justice Harlan took as undisputed the proposition that "a sound judicial discretion may call for the modification of the terms of an injunctive decree if the circumstances, whether of law or fact, obtaining at the time of its issuance have changed, or new ones have arisen", 364 U.S. at 647, 81 S.Ct. at 371. We can see no reason for a different view when the requirement is constitutional and a subsequent decision of the Court has made clear that the court entering the decree interpreted the requirement too broadly. *Theriault v. Smith,* 523 F.2d 601 (1 Cir.1975).

As his opinion discloses (pp. 1181 *et seq.*), the district judge felt free to choose between the different views of plaintiffs' and defendants' experts with respect to the value of the limitations on the size of the units to which the residents of Willowbrook were to be transferred. We now know, as a result of *Youngberg,* that this was not the appropriate inquiry. Once the defendants had established, as they unquestionably did, that abandoning the 15/10 and 6/3 bed limitations in favor of a 50 bed limitation would facilitate the emptying of Willowbrook and like institutions, the question was whether, in Chief Judge Seitz's phrase, "professional judgment in fact was exercised" or, in Justice Powell's formulation, "the decision by the professional is such a substantial departure from accepted professional judgment, practice or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment." 457 U.S. at 321, 323, 102 S.Ct. at 2461, 2462, 73 L.Ed.2d at 41, 42. We see no merit in the argument of the United States as *amicus curiae* (Brief, p. 38) that defendants irrevocably exercised their professional judgment when they agreed to the consent here; defendants' agreement was premised on their belief, now shown to have been untenable, that they could find enough small facilities to empty Willowbrook within a reasonable time. As said in *Swift, supra,* 286 U.S. at 115, 52 S.Ct. at 462, "[t]he consent is to be read as directed to things as they were." Since there is no suggestion that defendants' experts testified in bad faith, we very likely could simply reverse the denial of the defendants' request for modification and direct that it be granted. However, since *Youngberg* was not available to the parties at the time of the hearing or to the district judge at the time of his decision, fairness seems to make preferable a remand on the narrow issue whether the views expressed by defendants' experts as to the propriety of the 50 bed limitation constituted "professionally acceptable choices" or were "such a substantial departure from accepted professional judgment, practice or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment." [19]

The district court's findings of noncompliance with the Consent Judgment and its

**19.** In this connection we note that defendants are by no means alone in contending that placement in small community facilities is not appropriate for all mentally retarded persons. Recent decisions in *Kentucky Ass'n for Retarded Citizens v. Conn,* 510 F.Supp. 1233, 1250 (W.D.Ky.1980), *aff'd,* 674 F.2d 582, 585 (6 Cir. 1982), and *Garrity v. Gallen,* 522 F.Supp. 171, 195 (D.N.H.1981), recognize the growing perception among professionals in this field that placement in small group homes in the community may prove neither the "least restrictive" nor the safest alternative for some severely and profoundly retarded persons. See also Diver, *supra,* 65 Va.L.Rev. at 62; Frohboese & Sales, Parental Opposition to Deinstitutionalization: A Challenge in Need of Attention and Resolution, 4 Law & Human Behavior 1 (1980).

appointment of a Special Master to monitor future compliance are affirmed. The district court's denial of modification of the Consent Judgment and limited modification of the Flower Hospital Order are reversed and remanded for further proceedings consistent with this opinion. No costs.