Joseph BRILL, Edith Brill, Max Brown-
stein, and Beatrice Brownstein, individ-
ually and on behalf of all other persons
similarly situated, Plaintiffs,

v.

Brian WING, as Commissioner of the New
York State Department of Social Ser-
vices, Gary Fritz, as Commissioner of
the Ontario County Department of So-
cial Services, and Marva Livingston
Hammonds, as Commissioner of the
New York City Human Resources Ad-
ministration, Defendants.

David WILLIAMSON, by his next best
friend, James ROBERTSON, on behalf
of himself and all persons similarly situ-
ated, Plaintiffs,

v.

Brian WING, as Commissioner of the New
York State Department of Social Ser-
vices, Mary Pat Dolan, as Commissioner
of the Tompkins County Department of
Social Services, and Tompkins County, a
municipal corporation, Defendants.

Nos. 82–CV–1271, 79–CV–375.

United States District Court,
N.D. New York.

Aug. 13, 1996.

on that basis.

Cornell Legal Aid Society, Ithaca, NY, for Plaintiff Williamson and Plaintiff Class; Barry Strom, of counsel.

Greater Upstate Law Project, Rochester, NY, for Plaintiff Brill and Plaintiff Class; Ellen M. Yacknin, of counsel.

Ellice Fatoullah, New York City, for Plaintiff Brownstein and Plaintiff Class.

Legal Assistance of the Finger Lakes, Geneva, NY; Paul Ryther, of counsel.

Dennis C. Vacco, Attorney General of the State of New York, Department of Law, Syracuse, NY, for Defendant Brian Wing; Joanne Hunt Piersma, Assistant Attorney General, of counsel.

Phillip Van Der Karr, Ontario County Department of Social Services, Canandaigua, NY, for Defendant Fritz Ontario County Courthouse.

Henry Theisen, Tompkins County Attorney, Ithaca, NY, for Defendant Dolan.

Paul A. Crotty, Corporation Counsel, New York City, for Defendant Hammonds; David Drueding, Assistant Corporation Counsel, of counsel.

MUNSON, Senior District Judge.

## MEMORANDUM–DECISION AND ORDER

Presently before the court are cross-motions concerning a consent decree entered into by the parties and "so ordered" on September 3, 1985. Doc. 47 in 79–CV–375; Doc. 24 in 82–CV–1271.[1] The consent decree resolved disputes that had arisen over New York State's policy respecting the calculation of Medicaid benefits during the first six months an aged, blind, or disabled person is institutionalized in a medical or nursing facility, when such a person also has a noninstitutionalized spouse who is blind, aged, or disabled. Notice of Proposed Class Action Settlement, Ex. C att'd to Consent Decree, Doc. 24, at 1. It also addressed issues involving the notification of affected persons about spousal financial responsibility. *Id.* Plaintiffs now move to reopen the consent decree and for summary judgment. Pls.' Notice Mot., Doc. 52. Defendant Commissioner of New York State Department of Social Services cross-moves for vacatur of the consent decree, or alternatively, in the event that the court grants plaintiffs' motion, for an order joining the Secretary of the United States Department of Health and Human Services as a party defendant. Defs.' Notice Mot., Doc. 55. Defendant Commissioner of New York City Human Resources Administration emphasizes that joinder of the Secretary is necessary to prevent subjecting any of the defendants to inconsistent obligations. Letter from David Drueding, Ass't Corp. Counsel, Doc. 66. The following constitutes the court's decision in this matter.

## I. BACKGROUND

This action involves a class of plaintiffs consisting of all married couples residing in New York State, wherein one spouse is aged, blind, or disabled and has been or will be institutionalized in either: (1) a skilled nursing or intermediate care facility; (2) an acute

---

1. These two actions were consolidated. Order, Doc. 22, in 82–CV–1271. All citations to events and documents in the record hereinafter refer to case number 82–CV–1271.

care facility for more than six months; (3) an acute care facility on alternate care status as provided in N.Y.Comp.Codes R. & Regs tit. 18, § 505.20; or (4) an acute care facility for less than six months, when medical documentation provides that the client is not expected to return home. Consent Decree, Doc. 24, at 2–3. Expressly included within this class is a subclass of all persons who were applicants for or recipients of Medicaid from or through the Ontario County Department of Social Services. *Id.* at 3.

The consent decree provided for conditional discontinuance of the cases. Its terms required the New York State Department of Social Services ("DSS") to promulgate an administrative directive (ADM) which set forth new policies regarding the attribution of income between spouses. As explained in exhibits appended to the consent decree and intended for distribution to affected class members,

> The settlement generally provides that the Department of Social Services (DSS) will not automatically consider the income and/or resources of the spouse of an institutionalized Medicaid applicant/recipient to be available after the calendar month following the month of institutionalization. In the past, the income and/or resources of an aged, blind or disabled spouse of an institutionalized aged, blind or disabled applicant/recipient may have been considered for the six calendar months following the month of institutionalization. The settlement does not change the right of DSS to sue the spouse in an appropriate court for contribution toward a recipient's medical bills.

Notice of Proposed Class Action Settlement, Ex. C att'd to Consent Decree, Doc. 24, at 1–2.

This Notice is incorporated by reference into the consent decree. Consent Decree, Doc. 24, ¶ 14(b) at 11. The ADM also requires notification to applicants and noninstitutionalized spouses that Medicaid eligibility would not be affected by the community spouse's failure or refusal to contribute to the cost of medical care. *Id.* ¶ III(B) at 4.

Although the consent decree represents a comprehensive settlement of the consolidated actions, paragraph nineteen provides that:

> In the separate event that the statutes or other laws of the United States or of the State of New York, or the regulations of the United States Secretary of Health and Human Services shall be amended, changed, repealed or, in the case of the regulations of such Secretary, reinterpreted so as to require [DSS], in its judgment, to change the policies or procedures set forth under the terms of this decree ... [p]laintiffs may apply to the Court for such relief as they may deem appropriate concerning such change in the policies or procedures set forth under the terms of this decree, provided however, that the failure of plaintiffs to make such application shall be without prejudice to any subsequent action in this or any other Court by any person concerning such new policies or procedures.

*Id.* ¶ 19 at 15.

In 1989, after the execution of the consent decree, Congress passed and the President signed into law the Medicare Catastrophic Coverage Act ("the Act"), Pub.L. 100–360, 102 Stat. 683 (codified as amended in various sections of 26 and 42 U.S.C.). Under the Act, once an institutionalized spouse is determined eligible for medical assistance, federal and state Medicaid law govern the attribution of income to each spouse. 42 U.S.C. § 1396r–5; N.Y.Soc.Serv.Law § 366–c (McKinney 1992 & Supp.1996). The Act provides rules for determining how much of the institutionalized spouse's income may be applied to the cost of his or her care in the institution, and how much may be contributed to the support of community spouse. 42 U.S.C. § 1396r–5(d).

In response to the new law, New York State passed Social Services Law § 366–c, promulgated amended regulations at N.Y.Comp.Codes R. & Regs. tit. 18, § 360–4.10, and prepared and issued new administrative directives. *See* Defs.' Mem.Law, Doc. 57, at 3. Now plaintiffs return to this court, requesting that the court reopen the consent decree pursuant to paragraph nineteen and summarily enter a declaratory judgment that

several of DSS's policies, as embodied in its amended regulations and administrative directives, violate federal law. In particular, plaintiffs challenge: (1) DSS's practice and policy of requesting and allowing lawsuits for contributions from the income of a community spouse towards the costs of caring for the institutionalized spouse, Pls.' Mem.Law, Doc. 53, at 9–17; and (2) the budgeting methodology employed by the state in attributing income among spouses, *id.* at 23–37. Plaintiffs further seek a permanent injunction directing DSS to cure all the practices and policies declared unlawful and directing that DSS inform all class members of the decision of the court and of the class members' right to apply for corrective action consistent with any declaratory relief granted. *Id.* at 40.

The defendants oppose plaintiffs' motion, and move to vacate the consent decree pursuant to Fed.R.Civ.P. 60(b). Defendants characterize plaintiffs' motion as one seeking "an advisory opinion concerning the State's interpretation of a statute that was not in existence when the consent decree was signed, and concerning issues that are only tangentially related to the issues resolved by the [consent] decree." Defs.' Mem.Law, Doc. 57, at 9. Further, the defendants argue that none of the parties contemplated the wholesale change in federal law accomplished by the Medicare Catastrophic Coverage Act. *Id.* at 10. Because its substantive provisions have been "entirely superceded" by the new law, the defendants assert that the consent decree should be vacated. *Id.* at 11. In the event that the court rules in favor of plaintiffs, the defendants seek to join as a party-defendant the Secretary of the United States Department of Health and Human Services. *Id.* at 25. The Commissioner of the New York City Human Resources Administration concurs in the motion for joinder. Letter from David Drueding, Ass't Corp. Counsel, May 10, 1991, Doc. 66.

## II. DISCUSSION
### A. General Principles

The court commences analysis of these cross-motions with the observation that consent decrees have the attributes of both contracts and judicial orders. *United States v. ITT Cont'l Baking Co.,* 420 U.S. 223, 236 n. 10, 95 S.Ct. 926, 935 n. 10, 43 L.Ed.2d 148 (1975); *Securities & Exchange Comm'n v. Levine,* 881 F.2d 1165, 1178 (2d Cir.1989). Interpretations of consent decrees for the purposes of enforcement and for determining its scope generally are guided by traditional contract principles. *ITT Cont'l Baking Co.,* 420 U.S. at 238, 95 S.Ct. at 935; *Schurr v. Austin Galleries,* 719 F.2d 571, 574 (2d Cir. 1983). *But cf. New York State Ass'n for Retarded Children v. Carey,* 596 F.2d 27, 37 (2d Cir.1979) ("The Consent Judgment is no mere contract, even though reference to contract principles may be useful."). Modification of decrees affording purely prospective relief, however, present different considerations. Such motions are governed by Fed. R.Civ.P. 60(b). *Rufo v. Inmates of Suffolk Cty. Jail,* 502 U.S. 367, 378, 112 S.Ct. 748, 757, 116 L.Ed.2d 867 (1992). When a district court is confronted with a motion to modify a consent decree, particularly one which resulted from institutional reform litigation, the Supreme Court has directed that the standard should be an equitable, flexible one. *Id.* at 380–83, 112 S.Ct. at 757–60; *see also New York State Ass'n for Retarded Children v. Carey,* 706 F.2d 956, 969–70 (2d Cir.), *cert. denied,* 464 U.S. 915, 104 S.Ct. 277, 78 L.Ed.2d 257 (1983).[2]

The plaintiff class in this case seeks relief on two theories: contractual and equitable. Pursuant to the contractual prong of its motion, plaintiffs demand declaratory and injunctive relief under Paragraph 19 of the consent decree. Pls.' Notice Mot., Doc. 52. By its own terms, that provision is only applicable when DSS initiates changes in the "policies or procedures set forth under the

**2.** The court recognizes that there is some force to the argument that when a consent decree expressly provides for continuing jurisdiction, a district judge should refrain from exercising equitable powers to reopen the decree under circumstances not within the terms of the document. *Cf., e.g., EEOC v. Local 40, Int'l Ass'n of* *Bridge, Structural & Ornamental Iron Workers,* 76 F.3d 76, 80 (2d Cir.1996) (finding district court had no inherent equitable power to enforce decree after its contractual expiration). The Supreme Court's decision in *Rufo* however suggests such restrictions are not appropriate with institutional reform decrees.

terms of [the] decree." Consent Decree, Doc. 24. Hence, even before the merits of plaintiffs' contentions are reached, the court applies traditional contract principles to determine whether the issues raised are cognizable under paragraph 19. *See ITT Cont'l Baking Co.,* 420 U.S. at 238, 95 S.Ct. at 935; *Schurr,* 719 F.2d at 574.

However, in the event that paragraph 19 does not encompass the challenged actions of defendants, plaintiffs have alternatively asked for equitable relief, *viz.,* modification of the consent decree to the effect that the defendants must seek approval from this court for the new policies. Pls.' Mem.Law, Doc. 53, at 8–9. The court will apply the equitable standards explained in *Rufo* in evaluating whether this form of relief is appropriate. *See EEOC v. Local 580, Int'l Ass'n,* 925 F.2d 588, 593 (2d Cir.1991) (observing equitable power to modify supplements court's power pursuant to contractual continuing jurisdiction clause).

### 1. *Contractual Standards*

Addressing the first basis for reopening the consent decree, the applicable contract principles are relatively clear. The language of the consent decree defines the obligations of the parties. *United States v. Armour & Co.,* 402 U.S. 673, 681–82, 91 S.Ct. 1752, 1757–58, 29 L.Ed.2d 256 (1971). When the decree is "plain and unambiguous on its face, its meaning must be determined from the four corners of the instrument without resort to extrinsic evidence of any nature." *Goodheart Clothing v. Laura Goodman Enters.,* 962 F.2d 268, 272 (2d Cir.1992) (internal quotations omitted). On the other hand, when the terms of the consent decree are ambiguous, extrinsic evidence may be considered. *United States v. O'Rourke,* 943 F.2d 180, 187 (2d Cir.1991). Language is ambiguous if it is "reasonably susceptible of more than one interpretation." *Burger King Corp. v. Horn & Hardart Co.,* 893 F.2d 525, 527 (2d Cir.1990) (citing *Curry Rd. Ltd. v. K Mart Corp.,* 893 F.2d 509, 511 (2d Cir.1990)). Conversely, contractual language is unambiguous if it has a "definite and precise meaning." *John Hancock Mut. Life Ins. Co. v. Amerford Int'l Corp.,* 22 F.3d 458, 461 (2d Cir.

1994). Whether language is ambiguous is a matter of law for the court to decide through reference to the contract alone. *Mellon Bank v. United Bank Corp. of New York,* 31 F.3d 113, 115 (2d Cir.1994).

Even when language is ambiguous, there are limits on the court's use of extrinsic evidence. The aim of an interpreting court is to effectuate the intent of the parties as reflected in the consent decree itself. *Levine,* 881 F.2d at 1179; *United States v. Int'l Bhd. of Teamsters,* 829 F.Supp. 608, 615 (S.D.N.Y.1993). While the court may, when faced with ambiguous language, consider "the circumstances surrounding the formation of the consent order," *Wilder v. Bernstein,* 153 F.R.D. 524, 528 (S.D.N.Y.1994) (citing *ITT Cont'l,* 420 U.S. at 238, 95 S.Ct. at 935), *appeal dismissed,* 49 F.3d 69 (2nd Cir.1995), it may not "search for the 'purpose' of a consent decree and construe it on that basis." *ITT Cont'l,* 420 U.S. at 235, 95 S.Ct. at 934. The reason for this rule was explained by the Supreme Court:

> [T]he *decree* itself cannot be said to have a purpose; rather the *parties* have purposes generally opposed to each other, and the resultant decree embodies as much of those opposing purposes as the respective parties have the bargaining power and skill to achieve. For these reasons, the scope of a consent decree must be discerned within its four corners, and not by reference to what might satisfy the purposes of one of the parties to it.

*United States v. Armour & Co.,* 402 U.S. 673, 681–82, 91 S.Ct. 1752, 1757, 29 L.Ed.2d 256 (1971) (footnote omitted) (italics in original).

For these reasons, plaintiffs' referral to the original complaint in this action is unavailing to demonstrate jurisdiction pursuant to paragraph 19. *See* Pls.' Reply Mem. Law, Doc. 58, at 13–14. The court is not entitled to expand or contract the agreement of the parties as set forth in the consent decree. *Berger v. Heckler,* 771 F.2d 1556, 1568 (2d Cir.1985). One last rule of thumb is particularly important in the case at bar: documents incorporated by reference in the decree—such as the exhibits, the draft administrative directive, and the attachments—are an intrinsic part of the decree and are to

be given the same effect as the main document. *Crumpton*, 993 F.2d at 1028; *Levine*, 881 F.2d at 1179.

### 2. Equitable Standards

The *Rufo* case is recent and authoritative on the issue of what discretion a district court has in modifying an institutional reform consent decree pursuant to Fed.R.Civ.P. 60(b). Justice White stated the rationale for the flexible standard that won the day in that case:

> The upsurge in institutional reform litigation since *Brown v. Board of Education* [347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954)] ... has made the ability of a district court to modify a decree in response to changed circumstances all the more important. Because such decrees often remain in place for extended periods of time, the likelihood of significant changes occurring during the life of the decree is increased....
>
> The experience of the district and circuit courts in implementing and modifying such decrees has demonstrated that a flexible approach is often essential to achieving the goals of reform litigation.... The Courts of Appeals have also observed that the public interest is a particularly significant reason for applying a flexible modification standard in institutional reform litigation because such decrees "reach beyond the parties involved directly in the suit and impact on the public's right to the sound and efficient operation of its institutions."

502 U.S. at 380–81, 112 S.Ct. at 757–59 (citations and footnote omitted).

Consent decrees of this type must be "open to adaptation." *Carey*, 706 F.2d at 969. One court reasoned that a granitic resistance to modifying prospective institutional reform decrees in the face of subsequent changes "would inevitably make defendants wary of any decree imposing more than the bare minimum of affirmative obligations," thus discouraging settlement of such litigation by consent decrees. *Philadelphia Welfare Rights Org. v. Shapp*, 602 F.2d 1114, 1120 (3d Cir.1979) (defendant seeking modification following changes making compliance unreasonably difficult), *cert. denied sub nom.*

*Thornburgh v. Philadelphia Welfare Rights Org.*, 444 U.S. 1026, 100 S.Ct. 689, 62 L.Ed.2d 660 (1980).

Nevertheless, a party seeking modification of injunctive reform decrees is not automatically entitled to relief. The movant "bears the burden of establishing that a significant change in circumstances warrants revision of the decree." *Rufo*, 502 U.S. at 383, 112 S.Ct. at 759–60. Only then should the court contemplate the suitability of the proposed modification. *Id.* Modification is not normally available when the changes that occurred were actually anticipated. *Id.* at 385, 112 S.Ct. at 760–61. Obviously, modification is required when a decretal obligation is later held unlawful, and it may also be appropriate when the enjoined activity is subsequently found legal. *Id.* at 388, 112 S.Ct. at 762. Mere clarifications of the law do not alone suffice for a modification motion. *Id.* at 389–90, 112 S.Ct. at 762–63.

Having explained the contractual and equitable standards relevant to the instant inquiry, the court proceeds below to apply these considerations to determining whether the consent decree is the proper instrument to examine the validity of the two challenged DSS policies, namely: (1) DSS' right to request or sue for contributions from the income of community spouses for maintenance of their institutionalized partners, Pls.' Mem. Law, Doc. 53, at 9–23; and (2) the budgeting methodology employed by the state in attributing income among spouses, *id.* at 23–39.

### B. Requests/Suits for Contribution

Respecting the contractual basis for reopening the decree, paragraph 19 expressly limits the conditions under which the court may exercise jurisdiction to those situations where plaintiffs challenge *new* DSS practices that represent changes to "the policies or procedures set forth under the terms of [the consent] decree." Consent Decree, Doc. 24, at 14–15. Only if the challenged policies meet this criteria do plaintiffs have the right to "apply to the Court for such relief as they may deem appropriate concerning such change in the policies or procedures set forth under the terms of [the consent] decree."

*Id.* Absent the right to review granted plaintiffs in paragraph 19 of the consent decree, and except for its equitable power to modify, this court is without jurisdiction to decide the issues currently in dispute. *See EEOC v. Local 40, Int'l Ass'n of Bridge, Structural & Ornamental Iron Workers,* 76 F.3d 76, 80 (2d Cir.1996) (declining to permit jurisdiction over decree when it had expired by its express terms).

Concededly, the consent decree does address requests and lawsuits by DSS for contribution from community spouses for the care of the institutionalized spouses. However, in addressing suits and requests for contribution, the decree unambiguously and repeatedly disavows any intent to change or affect policies respecting contributions from community spouses. Paragraphs 3 and 4 of the decree for instance mandate the promulgation and distribution by defendant DSS commissioner of a "binding" administrative directive (ADM). Doc. 24, at 3–4. The draft ADM attached to the decree provides that "if the spouse in the community fails or refuses to make his/her income or resources available as requested, then the local agency may refer the matter to court for a review of the actual ability of the spouse in the community to pay." ADM att'd to Consent Decree, Doc. 24, at 3 ¶ 3(d).

Paragraphs 5 and 11 apply respectively to defendant commissioners of DSS and the New York City Human Resources Administration, and relate to the distribution of Attachment I. Doc. 24, at 4 & 9–10. Attachment I notifies a newly institutionalized spouse that "[i]f you have a spouse in the community, the Department of Social Services may request that your spouse contribute some portion of his or her income and resources toward the cost of your care." Attach. I to Consent Decree, Doc. 24. The next sentence states that the community spouse's refusal will not affect the institutionalized spouse's eligibility. *Id.* At the bottom of the attachment though, the reader is informed that if the community spouse does refuse to contribute, DSS "may, at its option, refer the matter to court for a review of your spouse's actual ability to pay." *Id.*

Paragraph 6 similarly provides for the distribution of a document relating that the authority of the state and its subdivisions and agencies to commence suit to enforce whatever legal obligations a community spouse might have is unchanged by the decree. Subparagraph 6(a) directs that Attachment IV be sent to community spouses. Doc. 24, at 5. Attachment IV informs recipients that the state "has the option to refer this matter to court for review of your actual ability to contribute." Attach. IV attached to Consent Decree, Doc. 24, at 15. Paragraph 8 of the decree orders defendant commissioner of the Ontario County Department of Social Services to also distribute Attachment IV. Doc. 24, at 7; *see also* Attach. II at 12 ("[T]his agency may refer this matter to court for a review of your actual ability to contribute. This review may result in a court order directing the amount of your contribution depending upon your financial circumstances and living expenses."); Attach. III at 13 (similar).

Reading further into the consent decree, paragraph 14 directs the DSS commissioner to distribute notices of the settlement, *id.* at 11–12, an example of which is attached as Exhibit C. That exhibit unequivocally informs the reader that "[t]he settlement does not change the right of DSS to sue the spouse in an appropriate court for contribution toward a recipient's medical bills." Ex. C att'd to Consent Decree, Doc. 24, at 2.

Although the exhibits and the draft ADM and its attachments are part and parcel of the decree by the doctrine of incorporation by reference, *Crumpton,* 993 F.2d at 1028, the court need not rely on these appended documents alone. The consent decree itself, without reference to any appended attachment, directive, or exhibit, provides as follows:

> 21. Nothing herein said, agreed or stipulated by and between the parties shall impair or limit the rights, duties or obligations of defendants arising under any statute to petition or apply for a judicial determination or judgment of spousal care, and liability for such support or care; and a judgment or order on a claim against a decedent's estate for such care or support,

or medical assistance; and judgment for such care, support, or medical assistance furnished on implied contract created by statute.

Consent Decree, Doc. 24, at 16–17.

From this litany of references in the decree to requests/suits for contribution, the court concludes that the parties clearly contemplated and acknowledged the DSS practice now being challenged, and intended to exclude that issue from the scope of the decree. The portions of the document referred to above are not "reasonably susceptible of more than one interpretation," *Burger King Corp.*, 893 F.2d at 527, and hence are not ambiguous. Reference to extrinsic evidence is consequently unnecessary. *Goodheart Clothing*, 962 F.2d at 272. That being the case, suits and request for contribution from community spouses cannot be "change[s] in policies or procedures set forth under the terms" of the decree within the ken of paragraph 19. The old accepted policy was that requests and suits were permissible. That is also the current policy, thus there has been no "change." Moreover, the request/suit policy was not "set forth" in the decree.

The fact that the power of DSS to bring court actions for support was both acknowledged in the decree and excluded from its scope also leads to the conclusion that the court should refrain from modifying the decree pursuant to Fed.R.Civ.P. 60(b). The Supreme Court has stated the general rule that events following the issuance of a consent decree normally cannot support a modification if they were actually anticipated. *Rufo*, 502 U.S. at 385, 112 S.Ct. at 760–61. Nothing could be clearer than that DSS' power to request and sue for contributions was known at the time the parties entered into their agreement.

It is true that *Rufo* advises that "[a] consent decree must of course be modified if, as it later turns out, one or more of the obligations placed upon the parties has become impermissible under federal law." *Id.* at 388, 112 S.Ct. at 762. And that is what plaintiffs have alleged. Pls.' Mem.Law, Doc. 53, at 10–11 (Medicare Catastrophic Coverage Act provides that "during any month in which an institutionalized spouse is in the institution . . . no income of the community spouse shall be deemed available to the institutionalized spouse."). However, DSS' challenged right to sue is *not* an "obligation" in the consent decree within the meaning of *Rufo*. These requests/suits are neither an obligation defendants were compelled to undertake nor an activity from which they were enjoined from pursuing. The request/suit issue was specifically excluded from the disputes resolved in the decree.

Arguendo, if federal law now prohibits these suits/requests and DSS is nevertheless engaging in the illegal activity, defendants could still be complying with their decretal duties, which in general deal only with notification to class members and the availability of community spouse income for institutionalized spouse expenses during the first six six months of institutionalization. *See* Ex. C att'd to Consent Decree, Doc. 24. A mutual misunderstanding of the law can conceivably constitute a ground for modification, but only if the parties to the consent decree relied on the incorrect interpretation. *See Rufo*, 502 U.S. at 390. In this case, although both parties assumed requests and suits for contribution were legal, no party relied on the assumption. The decree's express terms excepted DSS' right to request or sue from its subject-matter. The affirmative obligations of defendants under the decree are perfectly capable of being performed whether or not requests/suits are consonant with federal law. *See Ferrell v. Pierce*, 743 F.2d 454, 463 (7th Cir.1984) (declining modification of consent decree when no inconsistency between decree and subsequent legislation).

In sum, the request/suit issue is not a change to a policy or procedure set forth by the decree, and thus is not a proper ground for reopening pursuant to paragraph 19. Since the power to request and sue for contributions constitutes neither an affirmative obligation nor a prohibited activity by the decree's terms—and because the legality of such action is irrelevant to the duties imposed by the decree—equitable modification is also unwarranted, even assuming the Medicare Catastrophic Coverage Act has effected an intervening change in the law with

regard to this matter. Relief is consequently unavailable to plaintiffs and their motions concerning the DSS practice of seeking contributions from community spouses for the expenses of institutionalization by requests and suits are DENIED. Such denial is naturally without prejudice to any new court action,[3] and the court expresses no opinion as to the merits of the contention.

### C. Spousal Income Attribution

■ Speaking generally, this second issue addresses the availability of institutionalized spousal income for the support of community spouses. See Pls.' Mem.Law, Doc. 53, at 23. A community spouse is entitled to a "minimum monthly maintenance needs allowance" (MMMNA) for living expenses. 42 U.S.C. § 1396r–5(d)(3).[4] If the community spouse's monthly income is less than the MMMNA, the institutionalized spouse may deduct from his or her income (which would otherwise go to the costs of institutionalization) an amount known as the "community spouse monthly income allowance" (CSMIA). Id. § 1396r–5(d)(1)(B). The CSMIA is the difference between the MMMNA and the community spouse's "otherwise available income" (OAI). Id. Stated mathematically, OAI + CSMIA = MMMNA. Plaintiffs dispute DSS's method of calculating the community spouse's otherwise available income (OAI), arguing that federal law displaces the state's method. Pls.' Mem.Law, Soc. 53, at 26–27. It is alleged that DSS is inflating its calculations of OAIs in order to minimize CSMIAs and thus maximize the percentage of an institutionalized spouse's income directed toward the cost of his or her own care. The result is lower Medicaid costs to the state.

The court has searched the decree for references to the proper method of calculating the community spouse's OAI. The draft ADM mentions that the requested communi-ty spouse contribution "is based on the Table of Support." ADM att'd to Consent Decree, Doc. 24, ¶ III(A)(3)(d) at 3. This table is not found in the decree or its incorporated documents. There is another reference in the Information Notice meant for institutionalized spouses: "The amount of money that we will request as a contribution from your spouse's income is determined according to a sliding scale based on his or her income and the number of persons in the community depending on that income." Attach. I to Consent Decree, Doc. 24, at 11. The "sliding scale" is not appended to or explained anywhere in the decree. There are three "examples" explaining budgeting methodologies described in the draft ADM, and attached to the end of the decree. Examples I, II, & III att'd to Consent Decree, Doc. 24, at 20–23. But none of these explain how the OAI of the community spouse is calculated either. Thus it seems certain that the consent decree did not establish any particular calculus for DSS to use in determining what amounts it would request, and possibly sue for. Ergo, it is not credible that the current methodology for OAI calculations constitutes a change to any policy or procedure set forth under the decree, because the decree does not set forth any policy respecting OAI.

Plaintiffs argue that a broader construction of paragraph 19 is merited. Pls.' Reply Mem.Law, Doc. 58, at 14. The court has read paragraph 19 neither narrowly nor broadly, but fairly. To disregard the conditional language, "policies or procedures set forth under the terms of this decree," would work an unfair and unagreed expansion of the parties' bargain. See Berger, 771 F.2d at 1568 (court not entitled to expand or contract decree). If we do not read this language as limiting which challenges can be brought up pursuant to the contractual reopener, then the court will have assumed near plenary power to review any state activities related to Medicare/Medicaid for aged, blind, or dis-

---

3. The parties agreed that any motion to reopen instituted by plaintiffs would be "without prejudice to any subsequent action in this or any other Court by any person concerning such new policies or procedures." Consent Decree, Doc. 24, ¶ 19 at 15. As the challenged activities of defendants are continuing in nature, presumably plaintiffs will encounter no limitations or laches obstacles. Thus no other equitable considerations compel modification at this time.

4. The MMMNA is established by the states with reference to the official poverty line as defined by the federal government. See, e.g., N.Y.Soc.Serv. Law § 366–c(h) (McKinney 1992).

abled persons. The better interpretation is that the parties intended by paragraph 19 that the court have continuing jurisdiction only over the issues resolved within the decree's margins. The method for calculating OAI is not such an issue, and is not subject to review by dint of paragraph 19.

The question of whether the court should nonetheless invoke the traditional and talismanic powers of equity to modify the decree presents a closer question. As noted above, *Rufo* instructs that "a flexible approach is often essential to achieving the goals of reform litigation." 502 U.S. at 381, 112 S.Ct. at 758. And unlike the previous issue, the lack of reference to OAI calculation in the text leaves a mystery as to whether the parties in fact relied upon the then-existing method applied by DSS as a predicate condition for the decree. *Cf. Still's Pharmacy, Inc. v. Cuomo*, 981 F.2d 632, 637–38 (2d Cir.1992) (fact that decree expressly reserved right of state to use different methodology supported modification).

But the court concludes that the propriety of DSS' current OAI formula in no way offends the literal or substantial resolutions in the decree. Defendants are under no decretal obligation to adopt the OAI method advocated by plaintiffs. Perhaps, as plaintiffs argue, defendants are obliged by federal law to use plaintiffs' method. But that is irrelevant to what the decree mandates.

Nor have the general goals of the decree been compromised by the OAI issue. The benefits of the notice requirements for aged, blind, or disabled couples are still significant, and defendants are apparently still recognizing this obligation. Similarly, the OAI methodology does not affect the value of defendant's duty of disregarding community spouse income after the first month of institutionalization for purposes of Medicaid eligibility. Under the *Rufo* standard for equitable modification, the movant must show a *significant* change in factual conditions or the law. 502 U.S. at 384, 112 S.Ct. at 760. The court interprets this qualification as requiring not merely a substantial change, but one that touches upon the subject-matter of the decree and affects the value or performance of the decretal duties imposed. While the Medicare Catastrophic Coverage Act may have indeed worked a "wholesale change" in the underlying law, Defs.' Mem. Law, Doc. 57, at 10, the court perceives no way in which it has deprived any signatory to the decree, or any public interest implicated, of the benefit of the bargain.

As no OAI methodology was prescribed by the consent decree, it is not a policy or procedure covered by paragraph 19. The way OAI is determined is also irrelevant to the performance of defendants' agreed-upon obligations, and to the benefits to the class members and general public therefrom. The court again ventures no opinion on whether federal law permits the calculus now employed by defendants. Rather, this opinion holds that reopening or modification of the consent decree is an improper procedural method for raising the OAI issue, and these motions are DENIED.

## D. Defendants' Motions

 Defendants move to vacate the consent decree pursuant to Federal Rule of Civil Procedure 60(b)(6), and, should plaintiff's motion be granted, for permission pursuant to Federal Rules of Civil Procedure 19 and 21 to join the Secretary of the United States Department of Health and Human Services as a defendant. Defs.' Notice Cross–Mot., Doc. 55, at 2; Letter from David Drueding, Ass't Corp. Counsel, Doc. 66.

The analyses above of the court's equitable authority to modify the decree in large part determines defendants' motion for vacatur. *Rufo*'s principles are equally applicable to termination of institutional reform decrees. *Sweeton v. Brown*, 27 F.3d 1162, 1163 (6th Cir.1994), *cert. denied sub nom. Sweeton v. McGinnis*, —— U.S. ——, 115 S.Ct. 1118, 130 L.Ed.2d 1082 (1995). Defendants have not demonstrated that the Medicare Catastrophic Coverage Act has worked significant changes warranting vacatur of the decree. There is no claim or facts supporting the conclusion that intervening legal changes have made defendants' decretal duties "substantially more onerous," *Rufo*, 502 U.S. at 384, 112 S.Ct. at 760, or that the decree has become "unworkable because of unforeseen obstacles," *id.* (citing *Carey*, 706 F.2d at 969).

The continuation of the decree will not be "detrimental to the public interest," *id.*, but instead will continue to benefit elderly and disabled couples. Holding defendants to their obligations in this case is not a futile exercise. The two reforms accomplished in the decree are relevant despite the passage of the Act. *See* Pls.' Reply Mem.Law, Doc. 58, at 9–10 (listing circumstances in which consent decree is still relevant). The motion for vacatur is DENIED.

Because of the court's disposition of the other motions, defendants' cross-motion for joinder is also DENIED.

### E. Spousal Resource Attribution

The court has discovered an ambiguity in the consent decree relating to resource attribution. The Notice of Proposed Class Action Settlement states that DSS "will not automatically consider the income and/or *resources* of the spouse of an institutionalized Medicaid applicant/recipient to be available after the calendar month following the month of institutionalization." Notice att'd to Consent Decree, Doc. 24, at 1 (italics added for emphasis). However, the ADM provides that "[t]he resources of such a couple will continue to be considered mutually available for the succeeding six calendar months if such resources" meet a certain standard. ADM att'd to Consent Decree, Doc. 24, ¶ III(A)(3)(a) at 3. This possible inconsistency creates an ambiguity concerning what duty the decree imposes upon defendants regarding the attribution of spousal resources during the first six months of institutionalization. *See, e.g., Hurst–Rosche Eng'rs, Inc. v. Commercial Union Ins. Co.*, 51 F.3d 1336, 1345 (7th Cir.1995) (internal inconsistency rendering contract ambiguous).

The court notes this discrepancy only because it is possible that the state is violating its decretal obligations with respect to resource attribution. Plaintiffs are of the opinion that the decree did impose the duty described in the Notice of Settlement, not the ADM. *See* Pls.' Reply Mem.Law, Doc. 58, at 15. They also apparently concede that federal law now permits the resources of both spouses to be considered immediately available for the care of the institutionalized spouse. *Id.* Plaintiffs though have not moved to enforce whatever resource attribution duties are imposed by the decree, and defendants have not moved for modification. The court is reluctant to undertake either task sua sponte, without being briefed on just what resource allocation obligations the decree orders—the version in the ADM or in the Notice of Settlement. The court raises this point only for the benefit of the parties and whatever further petitions they wish to make.

### III. CONCLUSION

In sum, plaintiffs' motion to reopen the September 3, 1985 consent decree in the above-captioned case, and for injunctive and declaratory relief upon a motion for summary judgment, is DENIED. The alternative motion for modification of the decree is also DENIED.

Defendants' cross-motions to vacate the consent decree, or in the alternative, to join the Secretary of the United States Department of Health and Human Services, are DENIED.

It is So Ordered.